AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

UNITED STATES OF AMERICA

v.

Case No. 24-MJ- 4101

████████████████████
████████████████

**STEPHEN MILLER a/k/a Shaw**
**TORREN MILLER a/k/a T**
**MICHAEL DIMARTINO a/k/a White Boy**
**BRENDA ROPER a/k/a B**
**ROXROY ROPER**

*Defendants.*

## CRIMINAL COMPLAINT

I, MATTHEW D. HUDSON, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between October 2023 to present (July of 2024), in the County of Monroe, in the Western District of New York, the defendant, violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 and 841(a)(1)(A) | Conspiracy to possess with the intent to distribute and to distribute 5 kilograms or more of cocaine |

This Criminal Complaint is based on these facts:
See attached affidavit.
☒ Continued on the attached sheet.

_____
SPECIAL AGENT MATTHEW D. HUDSON
DEPARTMENT OF HOMELAND SECURITY
INVESTIGATIONS (HSI)
*Printed name and title*

Affidavit and Criminal Complaint submitted electronically by email in .pdf format. Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed.R.Crim. P. 4.1 and 4(d) on:

Date: July 26, 2024

City and State: Rochester, New York

_____
*Judge's signature*

HONORABLE MARIAN W. PAYSON
United States Magistrate Judge, WDNY
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

               v.                          24-MJ- 4101

█████████████████████
███████████████
STEPHEN MILLER a/k/a Shaw
TORREN MILLER a/k/a T
MICHAEL DIMARTINO a/k/a White Boy
BRENDA ROPER a/k/a B
ROXROY ROPER

_____

City of Rochester   )
County of Monroe   )  ss:
State of New York   )

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, **MATTHEW D. HUDSON**, a Special Agent with Homeland Security Investigations (HSI), being duly sworn, deposes and states as follows:

1.    I am a Special Agent with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI), and have been so employed since November 2019. I am currently assigned to the HSI Rochester Field Office and attached to the Greater Rochester Area Narcotics Enforcement Team (GRANET). My responsibilities include investigating violations of federal and state criminal laws, including crimes involving smuggling and narcotics trafficking. As such, I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make

arrests for offenses enumerated in Title 18, United States Code, Section 2516, and Title 21 of the United States Code. Furthermore, per the Interagency Cooperation Agreement between the Drug Enforcement Administration (DEA) and HSI, I am a cross-designated agent authorized to investigate violations of Title 21, United States Code.

2.      This Affidavit is submitted in support of a criminal complaint charging ██████████ ██████████ █████████ ██████████████, STEPHEN MILLER a/k/a Shaw, TORREN MILLER a/k/a T, MICHAEL DIMARTINO a/k/a White Boy, BRENDA ROPER a/k/a B, and ROXROY ROPER, with conspiracy to possess with the intent to distribute and to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846 and 841(a)(1)(A).

3.      As more fully described below, the facts in this Affidavit are based on a combination of my personal participation in this investigation, my review of police reports filed in connection with this investigation, conversations with other law enforcement officers involved in this investigation, and my review of conversations that have been intercepted pursuant to court-authorized eavesdropping warrants. The conclusions drawn in this Affidavit are based on my training and experience as well as the advice of other experienced federal, state and local narcotics investigators. Since this Affidavit is being submitted for a limited purpose, I have not included every fact that I know concerning this investigation. Rather, I have set forth only those facts that relate to the issue of whether probable cause exists to believe that the above-named defendants committed the above-described offenses. In support thereof, I respectfully state the following:

## I. INTRODUCTION

2

4.      Your affiant has been employed as an HSI Special Agent since November 2019. During my tenure with HSI, I have participated in numerous narcotics investigations during which I have conducted physical and wire surveillance, executed search warrants, and reviewed and analyzed recorded conversations and records of drug traffickers. Through my training, education, and experience (including monitoring wiretapped conversations of drug traffickers and surveillance on numerous occasions of individuals engaged in drug trafficking), I have become familiar with the manner in which illegal drugs including fentanyl, heroin, cocaine, and others, are imported, stored, transported, and distributed, the method of payment for such drugs, the various ways drug money is laundered, and the efforts of persons involved in such activities to avoid detection by law enforcement. I am aware that those who distribute controlled substances often use cryptic, coded or otherwise indirect language when telephonically discussing their illegal activities. I am also aware that those who distribute controlled substances will often add adulterants or additives to their controlled substances in order to increase the bulk of their distributable product, thereby increasing profit. I am aware that drug traffickers often use firearms in order to defend themselves against and deter rival drug traffickers and/or potential robbers, enforce debt collections, and in other capacities to further their drug trafficking. Therefore, drug traffickers frequently are in possession of firearms for these purposes.

## II. BACKGROUND OF INVESTIGATION

5.      HSI along with ATF, DEA, GRANET, RPD, and MCSO are investigating the drug activities of a drug trafficking organization (hereinafter "DTO") operating between Mexico, California, and the Western District of New York. The investigation has revealed

the DTO is moving bulk quantities of cocaine into the Western District of New York. The investigation has also indicated that the DTO likely conducts activity in the Northern District of New York. It is believed that the DTO's New York-based cell is headed by ████████████████ and is being supplied by ██████████████ **TORREN MILLER** and **MICHAEL DIMARTINO** are believed to be couriers for the DTO in the Rochester, New York area. ███████████ and **STEPHEN MILLER** are believed to be a mid-high level cocaine distributors supplied by ██████████████ The investigation has revealed that ███████████ will typically ship four (4) to eight (8) kilograms of cocaine, via UPS and FedEx, approximately two (2) times per week to **TORREN MILLER** and **MICHAEL DIMARTINO** at various UPS and FedEx stores around the Rochester, Buffalo, and Syracuse, New York areas. **TORREN MILLER** and **DIMARTINO** will then deliver large quantities of cocaine to ██████████ and ██████████ at pre-arranged locations. **TORREN MILLER** and **DIMARTINO** have also been observed delivering large quantities of cocaine to **BRENDA ROPER** in the Utica, New York area. ███████████ will then deliver large quantities of the cocaine directly to **STEPHEN MILLER** and other violators both known and unknown. G.N. is believed to supply ██████████████ with shipping labels and tracking information for cocaine shipments across the United States and from Mexico.

## TARGETS OF INVESTIGATION

6. ██████████████████████████████████████████
████████████████ was identified as the supplier of the cocaine being distributed into the Western District of New York and elsewhere. ████████ was identified as the user of cellular

4

telephone numbers (702) 910-1585 (hereinafter "**RR-1**") and (424) 944-6343 (hereinafter "**Target Telephone 1**"). This investigation has revealed that ██████ ships illegal narcotics, including but not limited to cocaine, from California to the greater Rochester area. During this investigation, numerous phone calls were lawfully intercepted between DTO members **TORREN MILLER**, ████████████ ████████████ **STEPHEN MILLER**, and ████████████ as outlined in more detail within this Affidavit. These calls have coincided with video and physical surveillance of ██████ **STEPHEN MILLER**, **MICHAEL DIMARTINO**, and **TORREN MILLER** receiving packages from ██████ and subsequently delivering these packages to various locations throughout the Western District of New York, the Northern District of New York and elsewhere.

7.        ██████ criminal history includes July 1, 1999 convictions for Conspiracy to Perform a Class A Felony in the Second Degree and Criminal Possession of a Controlled Substance in the Third Degree, for which ██████ was sentenced to three (3) to nine (9) years' incarceration.

8.        **TORREN MILLER** (DOB xx/xx/1985) of 284 Colwick Road, Rochester, New York, was identified as the drug courier for ██████ who would receive packages of cocaine from ██████ and distribute that cocaine to other members of the DTO. **MILLER** was identified as the user of cellular telephone numbers (585) 549-6087 (hereinafter "**TM-1**") and (585) 773-2747 (hereinafter "**Target Telephone 2**"). During this investigation, as referenced in more detail within this Affidavit, three (3) shipments containing approximately four (4) kilograms each of cocaine addressed to **MILLER** or fictitious names used by **MILLER** were seized from the United Parcel Service (UPS) facility in Louisville,

Kentucky.

9.     No felony convictions for **MILLER** has been uncovered by law enforcement to date.

10.     

▇▇▇, was identified as a kilogram level distributor of cocaine for ▇▇▇ in the Rochester, New York area.   ▇▇▇ was identified as the user of cellular telephone numbers (585) 260-2296 (hereinafter "**AM-1**"), (585) 978-4688 (hereinafter "**AM-2**"), (585) 414-0947 (hereinafter "**AM-3**"), and (585) 491-0485 (hereinafter "**AM-4**").   This investigation has revealed that ▇▇▇ distributes illegal narcotics, including but not limited to cocaine, throughout the greater Rochester area.   During this investigation, several phone calls were lawfully intercepted between ▇▇▇ utilizing **AM-1** and **AM-2**, and DTO members **TORREN MILLER** and ▇▇▇ as outlined in more detail within this Affidavit.   These calls have coincided with video and physical surveillance of ▇▇▇ receiving packages from ▇▇▇ and subsequently delivering these packages to **STEPHEN MILLER** at **MILLER's** residence at 154 Genesee Park Boulevard in Rochester, New York.

11.     No criminal history for ▇▇▇ has been uncovered by law enforcement to date.

12.     ▇▇▇

▇▇▇, was identified as a kilogram level distributor of cocaine for ▇▇▇ in the Rochester, New York area.   ▇▇▇ was identified as the user of cellular telephone numbers (585) 355-5808 (hereinafter "**NM-1**") and (680) 283-9467 (hereinafter "**NM-2**").   This investigation has revealed that ▇▇▇ receives cocaine shipped by ▇▇▇ from other

6

members of this DTO and distributes it within the Western District of New York. During this investigation, as referenced in more detail within this Affidavit, numerous cellular telephone calls were lawfully intercepted between ███████ and ██████████ discussing their DTO.

13.    ███████ criminal history includes an April 13, 2005 conviction for Possession of a Weapon in Furtherance of Drug Trafficking – Violent Crime/Drugs/Machine Gun/Firearms, for which he was sentenced to seventy-five (75) months imprisonment and sixty (60) months supervised release.

14.    **MICHAEL DIMARTINO** (DOB: xx/xx/1984) of 43 Mercer Avenue, Gates, New York, was identified as the drug courier of cocaine for ███████ and this DTO. DIMARTINO was identified as the user of cellular telephone numbers (716) 258-2766 (hereinafter "**MD-1**") and telephone number (585) 732-5074 (hereinafter "**MD-2**"). **DIMARTINO**, along with **TORREN MILLER**, receive kilogram-sized quantities of cocaine shipped by ███████ from California to Rochester, New York, and elsewhere. As referenced within the Affidavit, a package containing approximately 4.3 kilograms of cocaine shipped by ██████ and addressed to **DIMARTINO** was intercepted by HSI Louisville.

15.    No felony convictions for **DIMARTINO** have been uncovered by law enforcement to date.

16.    **STEPHEN MILLER** (DOB: xx/xx/1979) of 154 Genesee Park Boulevard, Rochester, New York, was identified as a kilogram level distributor of cocaine in Rochester, New York. **MILLER** was identified as the user of cellular telephone number (585) 333-

9846 (hereinafter "SM-1"). This investigation has revealed that **MILLER** received kilogram sized quantities of cocaine from ███████ for distribution in the Rochester, New York area. During this investigation, controlled purchases of cocaine were conducted from 115 Oriole Street, Rochester, New York, a residence that this investigation has determined is supplied directly by **MILLER**.

17. **MILLER's** criminal history includes a July 2, 1998 conviction for Felony Attempted Criminal Sale of a Controlled Substance in the Third Degree, for which **MILLER** was sentenced to one (1) to three (3) years' incarceration.

18. **BRENDA ROPER** (DOB: xx/xx/1974) of 367 Dutch Hill Road, Frankfurt, New York was identified as the ex-wife of ████████████ and a narcotics distributor for the DTO in Utica, New York.

19. **BRENDA ROPER's** criminal history includes a June 21, 2002 conviction for Importation of Cocaine, in violation of 21 U.S.C. 952(A) and 960(B)(3), for which **ROPER** was sentenced to one (1) day incarceration and three (3) years' supervised release; and a February 8, 2003 conviction for Conspiracy in the Second Degree, for which **ROPER** was sentenced to one (1) to three (3) years' incarceration.

20. **ROXROY ROPER** (DOB: xx/xx/1986) of 23594 Park South Street, Calabasas, California, was identified as a drug courier and driver for ████████████ This investigation has revealed that **ROXROY ROPER** lives with ████████████ █ ████████████████████████ and will transport both narcotics and ████████████ to and from E&G Mailboxes and watch Repair in Los Angeles, California.

21.   No criminal history for **ROPER** have been uncovered by law enforcement to date.

### III. PROBABLE CAUSE

22.   The current investigation began in June 2022 when a confidential source (CS) provided information to HSI Rochester and GRANET members regarding cocaine sales occurring at 115 Oriole St. in Rochester, New York. The CS informed investigators that a male individual known as "Foots" was selling cocaine and cocaine base from 115 Oriole St., a location belonging to and supplied by another male individual known as "Shaw". Through various investigative methods, to include open source information and law enforcement databases, HSI Rochester and GRANET members were able to identify "Foots" as A.M., residing at 115 Oriole St. in Rochester, New York and "Shaw" as **STEPHEN MILLER**, residing at 154 Genesee Park Blvd. in Rochester, NY. Beginning in the Fall of 2023, HSI Rochester and GRANET began surveilling **MILLER** utilizing covert electronic surveillance of 115 Oriole St.,152/154 Genesee Park Blvd., 81 Andy Lane, and 633 Post Ave., all locations in Rochester, New York used by **MILLER** to stash and distribute narcotics as well as bulk U.S. currency. In November 2023, while monitoring pole camera footage from 152/154 Genesee Park Blvd., HSI Rochester and members of GRANET observed a blue-colored Chevrolet Silverado, bearing New York license plate number LCN8521, parked in the driveway of 152/154 Genesee Park Blvd. A check of Department of Motor Vehicle (DMV) databases revealed the registered owner to be

████████████████████

23.    In December of 2023, ███████ was identified as a source of supply of narcotics for the targets of an ongoing state wiretap investigation by the Rochester Police Department. Through that wiretap investigation, investigators identified members of a drug trafficking organization operating in the Greater Rochester Area. This DTO, led by **SHAWN MCCLARY, TIMOTHY JACKSON,** and **GARY FULLER** (hereinafter "MCCLARY DTO") was identified as distributing kilogram-sized quantities of cocaine as well as trafficking firearms throughout the City of Rochester and surrounding communities. As the state wiretap investigation progressed, it was revealed that the MCCLARY DTO was being supplied with kilogram-sized quantities of cocaine by ████████████ and ████████████

24.    On December 8, 2023, the Honorable Julie M. Hahn, Monroe County Judge, issued an Order authorizing the interception of live communications over cellular telephone **AM-1**. On January 5, 2024, the Honorable Julie M. Hahn, Monroe County Judge, issued an Order authorizing the interception of live communications over **AM-2** and **RR-1**. On January 16, 2024, the Honorable Julie M. Hahn, Monroe County Court Judge, issued an Order authorizing the interception of live communications over **NM-1**. The investigative team intercepted numerous wire communications relating to the possession and distribution of controlled substances by ████████████ ████████████ **TORREN MILLER,** ████████████ and other criminal associates during the interception period.

## USE OF CONFIDENTIAL SOURCES

### A. Confidential Source One (CS-1)

10

25.     Confidential Source One (CS-1) has one (1) felony conviction in 2000 and has no current pending felony charges. CS-1 is currently a paid source of information and has provided information to law enforcement for approximately nine (9) months. CS-1 has provided agents and officers reliable information about narcotics trafficking that has been corroborated through independent investigation, consensual recordings of face-to-face and telephonic conversations, controlled purchases of narcotics, and information received independently and separately from other law enforcement agencies. CS-1's cooperation has resulted in the seizure of controlled substances and the resulting arrest of individuals. Your affiant knows CS-1 to be a reliable and trustworthy source of information. CS-1 indicated that the information CS-1 provided was based upon either personal observations or personal conversations either directly with the individuals involved or persons CS-1 knows to be closely associated with the individuals.

### B. Confidential Source Two (CS-2)

26.     Confidential Source Two (CS-2) has two (2) felony convictions in 1998 and 2007 and has no current pending felony charges. CS-2 is currently a paid source of information and has provided information to law enforcement of their own free will for over 15 years. CS-2 has provided agents and officers reliable information about narcotics trafficking that has been corroborated through independent investigation, consensual recordings of face-to-face and telephonic conversations, controlled purchases of narcotics, and information received independently and separately from other law enforcement agencies. CS-2's cooperation has resulted in the seizure of controlled substances and the resulting arrest of individuals. Your affiant knows CS-2 to be a reliable and trustworthy source of information. CS-2 indicated that the information CS-2 provided was based upon

11

either personal observations or personal conversations either directly with the individuals involved or persons CS-2 knows to be closely associated with the individuals.

## CONTROLLED PURCHASES FROM 115 ORIOLE ST.

27.    **During the first week of October 2023**, RPD investigators, utilizing CS-2, conducted a controlled purchase of a quantity of cocaine from 115 Oriole St., a residence that this investigation has revealed to be a cocaine distribution location operated and supplied by **STEPHEN MILLER**. Prior to the controlled purchase, investigators conducted a thorough search of CS-2 for the presence of contraband, which yielded negative results. RPD investigators issued CS-2 $20 U.S. Currency of law enforcement funds then drove CS-2 to the area of 115 Oriole St. Once CS-2 arrived at 115 Oriole St., CS-2 went directly to the front of 115 Oriole St. and handed $20 of law enforcement funds through a hole in the front door in exchange for a quantity of cocaine.  Upon completion of the transaction, investigators conducted a second search of CS-2 for the presence of contraband, which yielded negative results. Upon returning to the RPD Public Safety Building, the cocaine purchased from 115 Oriole street was tested using a Thermo Scientific TruNarc device, which returned positive for the presence of cocaine.

28.    **During the third week of October 2023**, RPD investigators, utilizing CS-1, conducted a controlled purchase of a quantity of cocaine from 115 Oriole St. Prior to the controlled purchase, investigators conducted a thorough search of CS-1 for the presence of contraband, which yielded negative results.  RPD investigators issued CS-1 $40 U.S Currency of law enforcement funds then drove CS-1 to the area of 115 Oriole St. Once CS-2 arrived at 115 Oriole St., CS-1 went directly to the front of 115 Oriole St. and was let inside

12

the residence. Inside the residence, CS-1 handed an unidentified female $40 in law enforcement funds in exchange for two (2) orange-colored baggies of cocaine base. A few minutes later, upon completion of the transaction, investigators conducted a second search of CS-1 for the presence of contraband, which yielded negative results. Upon returning to the RPD Public Safety Building, the cocaine base purchased from 115 Oriole street was tested using a field reagent test, which returned positive for the presence of cocaine.

29. **During the third week of November 2023**, RPD investigators, utilizing CS-1, conducted a controlled purchase of a quantity of cocaine from 115 Oriole St. Prior to the controlled purchase, investigators conducted a thorough search of CS-1 for the presence of contraband, which yielded negative results. RPD investigators issued CS-1 a quantity of law enforcement funds then drove CS-1 to the area of 115 Oriole St. Once CS-1 arrived at 115 Oriole St., CS-1 went directly to the front of 115 Oriole St. and handed the quantity of law enforcement funds through a hole in the front door in exchange for a quantity of cocaine. Upon completion of the transaction, investigators conducted a second search of CS-1 for the presence of contraband, which yielded negative results. Upon returning to the Public Safety Building, the cocaine base purchased from 115 Oriole street was tested using a field reagent test, which returned positive for the presence of cocaine.

30. **During the first week of January 2024**, RPD investigators, utilizing CS-2, conducted a controlled purchase of a quantity of cocaine from 115 Oriole St. Prior to the controlled purchase, investigators conducted a thorough search of CS-2 for the presence of contraband, which yielded negative results. RPD investigators issued CS-2 a quantity of law enforcement funds then drove CS-2 to the area of 115 Oriole St. Once CS-2 arrived at 115 Oriole St., CS-2 went directly to the front of 115 Oriole St., walked through the front

door, and walked up to the second floor hallway. At that time, CS-2 handed the quantity of law enforcement funds to A.M. in exchange for a quantity of cocaine. Upon completion of the transaction, investigators conducted a second search of CS-2 for the presence of contraband, which yielded negative results. Upon returning to the RPD Public Safety Building, the cocaine base purchased from 115 Oriole street was tested using a field reagent test, which returned positive for the presence of cocaine.

### December 9, 2023 Seizure of Cocaine from ███████████

31.    On December 12, 2023, at approximately 8:44 a.m., investigative team members lawfully intercepted a call from ███████████ utilizing **RR-1** to ███████ ███████ utilizing **AM-1**. In relevant part, ███████ and ███████ communicate the following:

███████    I have bad news to tell you.

███████    What's that?

███████    You know I lost that thing.

███████    What do you mean? You lost something yesterday?

███████    The thing that was supposed to come Saturday… it didn't come. It is still saying the same thing four of them. I'm telling you sometimes brother, I'm telling you sometimes I'm telling you it's rough on me man. Yeah man um I keep on watching it but nothing. Still not moving. It's just showing in the same place.

███████    Hmmmm [UI].

███████    Yeah telling me it's at the airport but when I track it, it's telling me it's at Kentucky. So I am wondering if someone held on to it over here and made it look like it's at Kentucky or whatever airport. It keeps pinging at the airport.

███████    Boy I don't know. I don't know. I don't know.

14

███████  That's what I'm saying [stutter] but then again, then again too, he, that is what he does because you see this is the thing. Let me show you this way you see when a man, you see these people here [stutter]. These people aren't regular, these people are people unless you decide to go to war with them. You understand what I'm saying they don't care, like, if something happens. You and them are doing these things and if something happens, if you're moving like you don't want to run to fix it or give them their things then it turns into something different. You understand what I'm saying? That's how they, these men are it's just how they are these Mexicans over here are different than the ones over there. You understand me? And then now, and then now the Dawg he doesn't want to run so much risk to put one thing and let something happen you understand? He said the link and make it arrive then if something happens, it's on them but he doesn't want to go boom and then [expletive] and then something happens [UI] fifty or a hundred grand he would have to kill himself or he would have to work for it. [UI] war with the Cartel you understand what I'm saying?

32.    Based on my training, experience, and knowledge of the investigation, your affiant believes that this conversation between ███████ and ███████ pertains to four (4) kilograms of cocaine that were lost during shipping on December 9, 2023. On December 15, 2023, HSI Rochester reached out to HSI Louisville inquiring about any recent cocaine seizures in Louisville, Kentucky that were destined for Rochester, New York. HSI Louisville confirmed that on December 9, 2023, a box bearing tracking number **1Z 6V6 6E2 44 4974 6096**, containing four (4) kilograms of brick-packed cocaine and a GPS tracker with audio capabilities addressed to "**TORIAN MILLER**" at 6558 4th Section Rd. Brockport, New York 14420 had been seized at the UPS facility hub in Louisville, Kentucky. Based on the fact that ███████ utilizing **RR-1**, tells ███████ utilizing **AM-1**, that he "lost four of them" as well as the package being addressed to a "**TORIAN MILLER**" in the Rochester, New York area, your affiant believes that ███████ is referring to the four (4) kilograms seized from the UPS facility hub in Louisville, Kentucky. Based on my training,

experience, and knowledge of the investigation, your affiant also believes that the "Mexicans" and the "Cartel" that ▆▆▆ mentions in this conversation refers to the Mexican Cartels as ▆▆▆ source of supply (SOS). The package, cocaine, and GPS tracker are depicted below:





33.    On December 12, 2023, at approximately 11:18 a.m., investigative team members lawfully intercepted a call from ▆▆▆ utilizing **NM-1**, to ▆▆▆ ▆▆▆ utilizing **RR-1**.   In relevant part, ▆▆▆ and ▆▆▆ communicate the following:

▆▆▆        Hello?

▆▆▆        What is going on?

What is going on, King Shango?

I'm here.

I'm saying, don't be vex because you love getting vexed. Um, if Monday comes and whatever, whatever, and, because I'm trying to clear up with these people to get some more and if you have a lot, can you lend me... you want to lend me a few of them?

Yeah, yeah. I could do that.

Alright, so I'm trying [stutter] because I have to clear up with these people so I can, so I can... it's one of my brethren down the road. He wants something, but [clears throat]. I have nothing more to give him because I'm waiting on the thing to come in to do the thing.

Yeah, yeah, yeah. I can give him a couple.

Ah?

Yeah, I can give you a couple, because I know you will come right back so I'm not... yeah.

Yeah, so...

It doesn't make sense to hold, you know?

Yes, that's what I'm saying [stutters] because what I want to do, I'm trying to get the ball rolling because, due to everything went out, I'm trying to get in everything as fast to give to them to re-load again.

Right.

Yeah.

Ok.

I'm hoping that this weekend, you can sort out something for me, too, because I want...

Yeah.

I want to knock them up.

[REDACTED]    Yes.

[REDACTED]    Yes.

[REDACTED]    So, if anything, alright? If anything um, um, Pablo [stutters] like how much you would lend me?

[REDACTED]    [Stutters] It depends on how much you want.

[REDACTED]    How much can I get? Two? Four? How much?

[REDACTED]    Four.

[REDACTED]    Four. Ok, alright. So, I'm going to, um, the ones that you have [stutters] are the ones that are in some clear wraps, right?

[REDACTED]    Yes, man. It's the same, yeah.

[REDACTED]    Ok, because these youth... he likes the one in the clear wrap. The Colt. The Colt is good but the Colt are kinda soft so, the one in the clear wrap is a little bit harder.

[REDACTED]    Right.

[REDACTED]    So, he likes those ones. So, I'm going to, um, if anything it's "Tori" I might make take it down for him.

[REDACTED]    Alright, just let me know.

[REDACTED]    Um, so, I'm going to reach out to him and see if he can bring it later because how many you have? 16, right?

[REDACTED]    Yeah.

[REDACTED]    So, then it works out. Runs on to 12. Alright, so I'm going to ask him if he can bring it down later for me.

34.    Based on my training, experience, and knowledge of the investigation, and based on the call referenced above, your affiant believes that [REDACTED] is asking [REDACTED] to provide four (4) kilograms of cocaine because [REDACTED] current supply for the Rochester and Utica, New York areas is running low and [REDACTED] has clients that

18

need to order more quantities of cocaine. Your affiant further believes that when █████████ asks █████ "16, right?" and █████ replies, "Yeah", █████ telling █████ that he has 16 kilograms of cocaine with him out in California that he cannot ship in time.

35. On December 14, 2023, at approximately 8:22 p.m., investigative team members lawfully intercepted a call from ████████████████ utilizing **AM-1** to █████ utilizing **RR-1**. In relevant part, ██████ and █████ communicate the following:



█████████    Hello?

█████████    How much am I to give T?

█████████    Um, 12.

█████████    Twelve? Ok.

█████████    Yeah. Ok?

█████████    Alright.

█████████    Alright.

36. Immediately following the above-referenced conversation, at approximately 8:23 p.m., investigative team members, utilizing a state court order authorizing the use of a GPS vehicle tracking device on ████████████████ 2018 Chevrolet Silverado pickup truck, observed █████████ leave the address of 312 6th St. in Rochester, New York. This investigation has revealed that the address of 312 6th St. is a bulk cash/narcotics storage location for █████████ Moments later, GPS vehicle tracking data showed █████████ traveled to the Dollar General Store parking lot located at 1004 Culver Road in Rochester, stayed at that location for approximately three (3) minutes, then departed.

37. Based on my training, experience, and knowledge of the investigation, your

affiant believes the above-referenced conversation, along with the GPS surveillance observed by investigative team members, indicates that ███████ and ███████ were arranging to deliver 12 kilograms of cocaine to **TORREN MILLER** at the Dollar General Store. Surveillance efforts and lawfully intercepted calls by investigative team members during this investigation have revealed that ███████ will systematically meet other narcotics distributors at this location soon after receiving bulk quantities of cocaine from ███████ As referenced within this affidavit, your affiant has identified **TORREN MILLER** as the individual this DTO refers to as "T".

38.    On January 8, 2024, at approximately 1:18 p.m., investigative team members lawfully intercepted a call from ███████████ utilizing **RR-1**, and **TORREN MILLER**, utilizing **TM-1**. In relevant part, ███████ and **MILLER** communicated the following:

███████          You gonna use Doo Doo tomorrow?

**MILLER:**       Yeah, me and Mike for tomorrow.

███████          It's just… it's just one thing coming. The other one come the [UI].

**MILLER:**       Alright, alright. Cool, cool. Then I'll go first.

███████          Bro, when you gonna… bro, when you gonna get the… the… the I.D. bro? The picture for me?

**MILLER:**       I obviously didn't doing then. Obviously.

███████          Yeah, 'cause Torren listen… and this is what, like, you are not taking seriously and the thing that… the thing that I sent to you that time when I tell you it didn't make it, boy… I just checked. The boys took it, man. What I'm saying… that's why I keep telling… but we need… we can't just keep using one name 'cause I've been using… I've been working your name for too long.

**MILLER:**       Alright, cool.

20

█████        We need a different name to at least try to, like, to try to at least balance out things. We can't do one name, one name, one name every day, every day, every day. That's not good. I keep telling you, that's why homegirl used to last so long because I had... she... I had her three different IDs.

MILLER:      Ok.

█████        So, that's what I'm saying. You need a I.D. 'cause I can't keep using... using your thing too much. 'Cause I've been using that shit for mad long.

MILLER:      Make sure I do that shit the next.

█████        Ah?

MILLER:      Payment out. I say I make sure I do that shit the next payment out.

█████        Yeah, I mean... and I mean you need to get me so we can use... so we can use.

MILLER:      I will make sure Mike bring [UI].

█████        So we can use the Buff and the Auburn and those place and use some different names and shit and just stop using the one name in the system. Just over and over and over [UI]. So, I'm a um... ah?

MILLER:      Aight.

█████        So I probably [UI] but this one... this one is gonna go down to, um, is gonna go down to homegirl.

MILLER:      Alright.

█████        Alright, cool.

MILLER:      Right, right, right.

█████        █████ says he was gonna take those from you later on so, yeah, cool.

MILLER:      Alright.

        39.    Based on my training, experience, and knowledge of the investigation, your

affiant believes █████ is directing **MILLER** to get new forms of photo identification in

21

order to receive packages of cocaine through UPS. As referenced above, █████ is shipping quantities of cocaine to UPS stores in the Rochester, New York area using **MILLER**'s name as the receiver. Your affiant believes █████ needs **MILLER** to send him a new picture so that █████ can obtain new forms of false identification for **MILLER**. Your affiant is aware that drug traffickers will commonly use false identification when trafficking their narcotics and bulk U.S. currency through shipping services as a way to evade detection from law enforcement.

40.    On January 9, 2024, at approximately 10:15 a.m., investigative team members lawfully intercepted a call from █████████████ utilizing **RR-1**, to **TORREN MILLER**, utilizing **TM-1**. In relevant part, █████ and **MILLER** discuss the following:

█████      Yeah, the dude come?

**MILLER:**      Ah?

█████      Um, it's there.

**MILLER:**      Aight, cool.

█████      Did he… did he… did he come yet?

**MILLER:**      Who?

█████      Just the driver, bro.

**MILLER:**      Oh, no… no he right around the corner from me, bro.

█████      Ok.

**MILLER:**      Aight. So we 'bout to start to just move. We 'bout to load up with that one he got and 'bout to grab this and go to Utie.

█████      He's gonna bring that one to you?

**MILLER:**      Yeah, the one he got he's bringing right now. We're about to grab the other

one and go to Utie.

**████**      Ok.

**MILLER:**      That's what you want me to do, right?

**████**      Yeah, the other thing is in his thing, you know?

**MILLER:**      It's in his name?

**████**      Yeah.

**MILLER:**      Alright, cool. So, when we get to Utie, what is they giving us?

**████**      Yeah, I'm trying... I'm trying to get **████** 'cause I'm, um, **████** got some money for me.

**MILLER:**      Aight. I just wanted to make sure we know what we doing. So... so, it's going to be 650 for him then today? It's going to be 4 for this package, 250 to bring it out there, 650 for that nigga today.

**████**      You do what?

**MILLER:**      I say we gotta work out something [stutters] unless I was not what getting paid nothing.

**████**      Alright, brother. Just... just call him and the thing... let me figure this thing out. Let me call **████**

**MILLER:**      Yeah, aight.

41.      Based on my training, experience, and knowledge of the investigation, your affiant believes **████** and **TORREN MILLER** are discussing the delivery of a quantity of cocaine from **████** to **MILLER**. Following the above intercepted call, at approximately 10:42 a.m., investigative team members conducting physical surveillance observed **MILLER** exit 284 Colwick Rd., a location identified as **MILLER's** primary address, carrying a bag. **MILLER** placed the bag in the trunk of a blue-colored Hyundai Sonata bearing New York license plate number HYJ3400 and entered the front passenger-

side of the vehicle before the vehicle left the area. A check of Department of Motor Vehicles (DMV) records revealed license plate number **HYJ3400** to be registered to **MICHAEL DIMARTINO** at 43 Mercer Ave. in Rochester, New York. Shortly after investigative team members observed **MILLER** leave 284 Colwick Rd., at approximately 10:47 a.m., investigative team members lawfully intercepted a call from ███████████ utilizing **AM-2**, to **TORREN MILLER**, utilizing **TM-1**. In relevant part, ███████ and **MILLER** communicated the following:

**MILLER:** [UI] Six minutes.

██████ What you said? Six minutes?

**MILLER:** Yep, six minutes. Where my nigga?

██████ Damn, am [UI]. You might... you might as well at Tops right here on Upper Falls, man.

**MILLER:** Tops on Upper Falls, man.

██████ Yeah. Yeah.

**MILLER:** Alright, cool. I'm on my way there right...

42. At approximately 10:55 a.m., investigative team members, conducting physical surveillance, observed **MILLER** arrive at Tops on Upper Falls Blvd. in the same Hyundai Sonata that **MILLER** was observed leaving 284 Colwick Rd. Investigative team members then observed **MILLER**'s vehicle pull up next to ██████████ 2018 Chevrolet Silverado pickup truck, **MILLER** exit the front, passenger-side of the blue-colored Hyundai Sonata, retrieve two (2) boxes from the trunk of the Hyundai Sonata, and load the two (2) boxes into the bed of ██████ pickup truck before leaving the area. Based on my training, experience, and knowledge of the investigation, your affiant believes

24

that **MILLER** was delivering a quantity of cocaine to ███████ During the lawfully

intercepted call referenced above, ████████████ tells **MILLER** that "█████ owes

him some money. This investigation has revealed that the DTO refers to ████████

████████ as "█████ Therefore, based on the above-referenced call and information,

your affiant believes ██████ **MILLER**, and ████████ are all conspiring to distribute

cocaine in the Rochester, New York area.

43. On January 9, 2024, at approximately 12:36 p.m., investigative team

members lawfully intercepted a call from ████████████ utilizing **RR-1**, to ████████

████████ utilizing **AM-2**. In relevant part, ██████ and ████████ communicated the

following:



███████  Hello?

███████  Yo.

███████  What's up? Um, quick... quick question. You think I can get, um, get a four tomorrow?

███████  Four what?

███████  Four of the things.

███████  If... if you can get four of them back?

███████  No, man. No, like, four beat out.

███████  Oh, oh, oh, oh no. I will see. I don't think so. I will see, though, and let you know [UI].

███████  How much you have now?

███████  Um, I have about two now [UI].

███████  [UI] I will see if I can get sumin from Ford. I'm trying because, I was telling you that dude is who I was giving everything dog, I need... I'm going down

in a hole. I need to try to do sumin on my thing to try to catch up for a little bit.

████████  Alright. Don't say anything [UI].

████████  Alright. So, let me what?

████████  What is there I'll give to you. I have two already.

████████  Alright. Let me see sumin. I'll call the dog and see sumin.

████████  Alright, later.

████████  Alright.

44.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes that ████ and ████ are conspiring to exchange four (4) kilograms of cocaine. ████ tells ████ that he only has two (2) at the moment but assures ████ that he will call another source of supply to see if he can obtain another two (2) kilograms.

45.    On January 10, 2024, HSI Rochester received information that ████ ████ had shipped a quantity of cocaine, addressed to **MICHAEL DIMARTINO**, scheduled to arrive at 345 Broadway in Buffalo, New York, a UPS Store in Buffalo, New York. Investigative team members intercepted a call on January 10, 2024 between **RR-1** and **TM-1** where ████ advised **TORREN MILLER** that the package was delayed and should be there on January 11, 2024. HSI Rochester contacted HSI Louisville requesting the package be detained and a search warrant be written. At approximately 12:36 p.m., HSI Louisville advised HSI Rochester that a search warrant had been issued for the above-referenced package and the package had been searched. Contained within the package was approximately 4.3 kilograms of cocaine and a TKSTAR GPS tracker with audio recording.

26

HSI Rochester accepted custody of the package, which was logged in with the RPD's Evidence Custodian. The package, cocaine, GPS tracker, and a photo of the drug field test are depicted below.



46.    On that same January 10, 2024 date, at approximately 7:11 p.m., investigative team members lawfully intercepted a call from ███████████ utilizing **RR-1**, to **TORREN MILLER**, utilizing **TM-1**.    In relevant part, ██████ and **MILLER** communicated the following:

27

**MILLER:**     Yup.

█████████     Yo, Torren.

**MILLER:**     Yea.

█████████     I don't know... I don't know what the fuck is going on with this shit out there, man. We gotta... we need some different names, bro. Them... I think all the name is, like, I think the names is fucking worn out, bro.

**MILLER:**     Why? What happened?

█████████     I don't know is, like, I don't know how this shit look but I'm watching now... it's saying that, first it's saying left. Now it's saying that it's still there is, like, and then the tracker is off, like, the tracker is turned off. So, I was waiting to see if it was going to show that it is online but it... I don't know? You know what I'm saying?

**MILLER:**     Oh.

█████████     [UI] still haven't done that shit, bro. It's, like, you don't take that shit serious, bro. I can't use your guys name no more. It's, like, I going to have to find somewhere else to fuck with this shit 'cause I think the names is getting weared out, bro.

**MILLER:**     I... I still got some. I still got a little name so...

█████████     Huh?

**MILLER:**     I still got a new name and he said he found one too.

█████████     He... so, I didn't. So, you got a new name?

**MILLER:**     Yeah.

█████████     So, why didn't you tell me? That's what I'm saying to you... here I keep telling you about, 'cause I keep telling... remember I'm using you guys thing like five times a week, bro. After a while those things start to look suspect.

**MILLER:**     Alright, I got...

█████████     ... and look at, look at that's what's going on now.

**MILLER:**     I got a new name already.

28

███████    You should have tell me that before you was doing that. That's what I am saying, like, you guys gotta understand it's, like, you don't take it serious, bro. Like, I shouldn't have to be losing shit for it to be fucking, like, you know what I mean? Take the shit serious , bro, 'cause I dunno?

**MILLER:**    Got it. Alright, well, I got one ready for whenever you ready so…

███████    Taking too much loss though, man. This is, like, fucking twelve of them shits get lost now, bro.

**MILLER:**    Just… are you… are you… we not positive but I understand what you are saying.

███████    No, the first one. I'm positive about the first one, bro. [UI] people have it… the one with your name. Told you that already. The people took it. The one that was supposed to come the people… the people have that shit, bro. And then the other one is due tomorrow. The shit is… how it is going. I don't like how this shit look right now. Damn, man.

**MILLER:**    Alright, well I got my name already. [UI] my have my other ready too, bro.

███████    Alright.

**MILLER:**    Either way, I got mine ready all… anytime ready.

███████    Alright, Ima… Ima… I'll hit you back, alright?

47.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call in conjunction with the 4.3 kilograms of cocaine seized from the UPS facility hub in Louisville, Kentucky, your affiant believes ███████ and **TORREN MILLER** are discussing losing the 4.3 kilograms to law enforcement. ███████ mentions the GPS tracker contained within the package being turned off, which coincides with law enforcement seizing the package and turning the GPS tracker off. Your affiant further believes that this DTO has established a continuous pattern to further their drug trafficking enterprise. As referenced within this Affidavit, HSI seized a package on

December 9, 2023, containing approximately four (4) kilograms, shipped from ██████ and addressed to **MILLER**. The packaging of the four (4) kilograms was taped in the same manner as the packaging of the above-referenced seizure. The GPS tracker contained within the December 9, 2023 seizure was also the same exact make and model as the GPS tracker contained within the above-referenced package. Your affiant believes, based on the facts stated above, that ██████ and **MILLER** have been, and continue to, conspire to distribute cocaine within the Western District of New York.

      48.    On January 11, 2024, at approximately 9:06 a.m., investigative team members lawfully intercepted a call from **TORREN MILLER**, utilizing **TM-1**, to ██████ ██████ utilizing **RR-1**. In relevant part, **MILLER** and ██████ communicate the following:

| | |
|---|---|
| ██████ | Hello? |
| **MILLER:** | What was the address again? |
| ██████ | 345 Broadway. |
| **MILLER:** | [laughs] That shit, man. Broadway, oh it was Broadway that's why. Ok, alright. I put it in wrong. |
| ██████ | Alright. |
| **MILLER:** | Alright, I got it. |
| ██████ | Mmhmm. |

      49.    At approximately 2:12 p.m., investigative team members lawfully intercepted a call from ██████ utilizing **RR-1**, to **TORREN MILLER**, utilizing **TM-1**. In relevant part, ██████ and **MILLER** communicate the following:

| | |
|---|---|
| **MILLER:** | Yo. |

████████    Yeah, just get me an address bro. I'm gonna send it to the regular address instead of sending it to that place.

MILLER:    Right. Ok, cool. Cool. So, we use Mike's house.

████████    What? No, don't use Mike.

MILLER:    Don't use Mike house? Hello?

████████    Yeah, don't use Mike house bro. I'm not gonna use Mike [stutters] give me someone else. I'm not gonna use his name. Huh?

MILLER:    I said we got to figure ut another address 'cause that's the only two we have. Mine and his.

████████    Alright, so... if you do his, we have to use a different name.

MILLER:    Alright. So, what you gonna do it as? Matt?

████████    I'm gonna use Amanda name.

MILLER:    Alright, cool. Cool. Yeah, just send it underneath that name. That works, yeah.

████████    Just in case, yeah.

MILLER:    Yeah, that's a good move.

████████    [UI]

MILLER:    Alright, I'm about to tell him now.

████████    Alright. I'm gonna send it. There's nothing in it, so [UI].

MILLER:    I already know.

████████    Alright.

MILLER:    I got you.

████████    Yeah.

50.    Phone toll analysis of **TM-1** showed one (1) outgoing call to **MD-1**

31

immediately following the above-referenced conversation. Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, in conjunction with phone toll analysis of **TM-1** immediately following the above referenced call, your affiant believes that **MD-1** was a number being utilized by **MICHAEL DIMARTINO**. Following the call to **MD-1**, investigative team members lawfully intercepted a call at approximately 2:18 p.m. from **MILLER**, utilizing **TM-1**, to ███████ utilizing **RR-1**. In relevant part, **MILLER** and ███████ communicate the following:

███████        Hello?

**MILLER:**        Yeah, his address we'll use.

51.    Phone toll analysis of **TM-1** showed one (1) more call to **MD-1** immediately following the last conversation between **TORREN MILLER** and ███████████ as referenced above. Based on my training, experience, and knowledge of the investigation, and based on the calls referenced above, your affiant believes that ███████ and **MILLER** are discussing sending an empty package to **MICHAEL DIMARTINO** to see if it will be intercepted by law enforcement. Previously intercepted calls have indicated that ███████ became irritated by the loss of his narcotics to law enforcement seizures. Your affiant is aware that narcotics traffickers and distributors will occasionally send "test" packages through parcel services to see if they will be seized or lost. Your affiant believes that when ███████ and **MILLER** are referring to "Mike", they are talking about **DIMARTINO**. Your affiant further believes that the outgoing call from **TM-1** to **MD-1** immediately following **MILLER** and ███████ conversation, referenced above, was a call to **DIMARTINO**, who is the actual user of **MD-1**.

32

52.    On January 15, 2024, at approximately 5:17 p.m., investigative team members lawfully intercepted a call from ███████████ utilizing **NM-1**, to ███████ ███████ utilizing **RR-1**.    In relevant part, ███████ and ███████ communicate the following:

███████        Hello?

███████        Yo.

███████        Yes, I was checking. Is 9:30 good?

███████        9:30 tonight?

███████        Yes, because that's when ███████ says he can be ready.

███████        Alright.

███████        That's cool?

███████        Yea, yeah. That's cool.

███████        Alright, thank you. Wrap it in box like you normally do for me and put duct tape on it so they can't get to it. You heard me?

███████        Alright.

███████        Alright, thanks.

53.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes that ███████████ was instructing ███████████ to wrap a quantity of U.S. Currency in duct tape and have it ready for delivery at 9:30 p.m. that night.    Your affiant further believes that ███████ referred to by his nickname "███████ by ███████ is the individual that will be picking up the quantity of U.S. Currency from ███████.

54.    Later that night, at approximately 9:00 p.m., investigative team members

33

lawfully intercepted a call from ▇▇▇▇ utilizing **NM-1**, to ▇▇▇▇ utilizing **RR-1**. In relevant part, ▇▇▇▇ and ▇▇▇▇ communicate the following:



▇▇▇▇    What? What's up?

▇▇▇▇    You tell me, big bro.

▇▇▇▇    You told me 9:30 and you called me 20 times, bro. What's going on?

▇▇▇▇    I was calling you 50 times.

▇▇▇▇    Yes, what's going on?

▇▇▇▇    No , because I'm making sure I can get you because the youth [stutters] is on his way. But, because I know you go to sleep early and those things, I was just trying to let you know that.

▇▇▇▇    Is he here? Is he not here?

▇▇▇▇    No, no mon. He will get here at 9:30.

▇▇▇▇    Alright.

▇▇▇▇    But, I was just giving you a little [stutters] heads up because I know it's hard to get you when it's late.

▇▇▇▇    Alright, alright.

▇▇▇▇    Alright. And let me [stutters]… your, your, your funds… do they have in, do they have in a lot of small bills? They have nice bills in them, right?

▇▇▇▇    No, they got… I got, it's, like, almost $3,000 in small bills.

▇▇▇▇    As almost $3,000 is small bills?

▇▇▇▇    Yes. That's it.

▇▇▇▇    Ok.

55.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes ▇▇▇▇ and ▇▇▇▇

34

█████ are conspiring to distribute cocaine for $3,000 in illicit proceeds. Your affiant further believes that ██████ is calling to ensure that ████████ will be ready for ███████ to pick up the quantity of U.S. Currency referenced above. Throughout this investigation, it is common for ████████ to call other DTO members to follow up with his deliveries and/or shipments of cocaine.

56.    On January 19, 2024, at approximately 1:14 p.m., investigative team members lawfully intercepted a call from ████████████ utilizing **RR-1** to **TORREN MILLER**, utilizing **Target Telephone 2**. In relevant part, ████████ and **MILLER** communicate the following:

██████        What's up? You good?

**MILLER:**        Yeah, what's up?

██████        Ok, the other thing… the other thing is there.

**MILLER:**        Aight. Just gotta wait for her to get out. She be getting out soon.

██████        I thought you say when she get out is… Wednesday she get out at 2:30?

**MILLER:**        No, on Wednesday she can't do it. That's what it is.

██████        [mumbles]

**MILLER:**        You know- that she can't do it on Wednesday. She said she get out at 2.

██████        You confused. Wednesdays is when you said she get out at 2 something.

**MILLER:**        Nope. No, Wednesday is when she can't do it at all. That's what we said.

██████        Ok.

**MILLER:**        I mean it's just that but she should be out soon… by 2 so he already gonna be on his way to meet up with her. We're gonna try to get it as quick as possible.

██████        Um, and when you… when you… is, uh, is that, um…

**MILLER:** Gotcha. Cool, cool.

████████ Hylan. And... and when you, when you get it, I think you should... It's when you coming out the house with that 2, don't... you put it, like you put it, like, in a bag.

**MILLER:** Of course.

████████ Ok, then... and then you probably ride down the road and fix it up, like, how you wanna fix it up. You know what I'm saying?

**MILLER:** Right, right, right.

████████ Yeah. [counting something in the background] That's one, two, three. Ok so, um, alright so that's... that's all it is, man.

**MILLER:** Aight.

████████ Alright, cool.

57.     Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes ████████ is telling **MILLER** that a package containing narcotics has arrived in Rochester, New York.  When **MILLER** tells ████████ "I mean it's just that but she should be out soon... by 2 so he already gonna be on his way to meet up with her," your affiant believes **MILLER** is referring to **MICHAEL DIMARTINO** picking up another female after work and taking that female out to receive the package at a UPS store located at 300 Hylan Drive in Rochester, New York.

58.     Immediately following the above-referenced call, investigative team members initiated surveillance on the UPS Store located at 300 Hylan Drive in Rochester, New York. This investigation has revealed that ████████ consistently ships kilogram-sized quantities of cocaine to **MILLER** utilizing various UPS stores located throughout the Rochester area.

59.     At approximately 2:38 p.m. on that same date, investigative team members

36

lawfully intercepted another call from ▮▮▮ utilizing **RR-1**, to **MILLER**, utilizing **Target Telephone 2**. In relevant part, ▮▮▮ and **MILLER** communicate the following:

▮▮▮     Hello?

**MILLER:**     Yeah, they on they way there now.

▮▮▮     Ok. Ok.

**MILLER:**     Alright.

    60.     Based on my training, experience, and knowledge of the investigation, and based on the above-referenced conversation, your affiant believes **TORREN MILLER** is telling ▮▮▮ that **MICHAEL DIMARTINO** and the other female are on their way to the UPS Store on Hylan Drive.

    61.     At approximately 3:00 p.m. on that same date, investigative team members physically surveilling the UPS Store at 300 Hylan Drive in Rochester, New York, observed **MICHAEL DIMARTINO** and an unknown white female arrive in a blue-colored Hyundai Sonata, bearing New York license plate number **HYJ3400** and registered to **DIMARTINO**. The female exited the front, passenger-side of the vehicle and entered the UPS Store. Moments later, the same female was observed exiting the UPS store with one (1) box under her arm. The unknown female loaded the box into the trunk of **DIMARTINO**'s vehicle before the vehicle was observed leaving the parking lot.

    62.     Based on my training, experience, and knowledge of the investigation, and based on physical surveillance conducted, the lawfully intercepted call referenced above, your affiant believes the box referenced above contained a quantity of cocaine. The size, shape and color of the box that was placed in the trunk of **DIMARTINO's** vehicle is

consistent with the size, shape and color of previous cocaine packages sent to Rochester, New York by ███████████

63.    At approximately 3:21 p.m. on that same date, investigative team members lawfully intercepted a call from ████████ utilizing **RR-1**, to **MILLER**, utilizing **Target Telephone 2**. In relevant part, ████████ and **MILLER** communicate the following:

████████         See the white box inside?

**MILLER:**    Yep. See it.

████████         Ok, so that's... take, take the white box out and you can bring the white box outside but don't [UI] like I was telling you earlier.

**MILLER:**    Alright, I gotchu.

████████         Because that's what they bring.

**MILLER:**    Gotcha. Akright, cool.

████████         Alright.

**MILLER:**    I'm about to go get everything else. We on our way.

████████         Yeah, so, so, ok cool. So, so it's that box... so it's two box plus the single. Ok. Alright.

**MILLER:**    Yep. It was all there.

████████         Ok, cool.

64.    Based on my training, experience, and knowledge of the investigation, and based on the lawfully intercepted calls between ████████ and **MILLER** and the physical surveillance by investigative team members, your affiant believes ████████ **MILLER**, and **DIMARTINO** are conspiring to traffic cocaine into the Rochester area. This investigation has revealed a pattern between ████████ **MILLER**, and **DIMARTINO** where ████████ will

38

contact **MILLER** with instructions on how many packages are being sent to Rochester and at what locations, typically UPS Stores, the packages will arrive. Your affiant further believes, based on the lawfully intercepted calls between ███████ and **MILLER** and based on the conversation between ███████ and **MILLER** following the seizure of 4.3 kilograms of cocaine, that ███████ and **MILLER** are using other unknown individuals, typically females, to receives the cocaine shipments from UPS stores. Your affiant is aware that narcotics traffickers will typically use false or fraudulent names when sending and receiving narcotics. Your affiant also believes that ███████ and **MILLER** are using such a tactic as a way to conceal their drug trafficking activities and evade detection by law enforcement.

### January 24, 2024 Seizure of Cocaine from ███████

65.     On January 24, 2024, at approximately 9:11 a.m., HSI Louisville contacted HSI Rochester regarding a package seized at the UPS World Hub in Louisville, Kentucky. The package was addressed to **MAURICE MCCLARY** at 43 Mercer Avenue in Rochester, New York. HSI Louisville executed a search warrant on this package and it contained approximately 3.68 kilograms of cocaine. This investigation has revealed that, although **MAURICE MCCLARY** is believed to be a fictitious name, the address at 43 Mercer Avenue is the current residence of **MICHAEL DIMARTINO**. The seized cocaine and the package are depicted below.



66.    Approximately 48 minutes later, at 9:59 a.m., investigative team members lawfully intercepted a call from ███████ utilizing **RR-1**, to **TORREN MILLER**, utilizing **Target Telephone 2**. In relevant part, ███████ and **MILLER** communicate the following:

| | |
|---|---|
| **MILLER:** | Yeah? |
| ████████ | Hello? |
| **MILLER:** | Yeah. |
| ████████ | That shit delayed, bro. |
| **MILLER:** | Oh. |
| ████████ | God damn it, man. |
| **MILLER:** | Yeah, man. I had a feeling it got delayed. |
| ████████ | I'm probably gonna have to make you bring that thing down to homegirl and make sure she pays you. |
| **MILLER:** | Alright, cool. Cool. That works. I got to get this shit. |
| ████████ | Yeah, alright. Damn, man. What the fuck is going on, man? |
| **MILLER:** | It's that two-day shit, man. [UI] every time we did the two-day, it did that. |
| ████████ | Nah. |

MILLER:    It was never the overnight.

████████    No, the other one wasn't two-day. It was one-day.

MILLER:    Right, right. The first one went through. And then, when you did my shit, that shit was a two-day and it still did the same thing. See what I mean?

████████    Mmhmm.

MILLER:    Yeah, when it came to Mike, it was a two-day. Bro, it was a two-day and still had a delay. Remember?

████████    Nah.

MILLER:    Yeah!

████████    Yeah, that [stutters]. No, that was a one-day.

MILLER:    Yeah.

████████    You mean the FedEx? No, that was a one-day.

MILLER:    You swear, nigga? I could have...

████████    Yeah, I sent it. It was a one-day.

MILLER:    Damn, 'cause I could've sworn that one to Mike...

████████    No, man. That was a one-day. Just got delayed two days.

MILLER:    Oh, ok. That's what you are saying. Ok, ok. Yeah, them niggas having a little delay. That shit don't make no sense. I know you're not stressed.

████████    Alright, I'm gonna call homegirl and let you bring that thing down the road.

MILLER:    Alright, cool. It'll be, like, after 2. Mike's still finishing his shit.

████████    Yeah.

MILLER:    Alright, cool.

████████    Let me know.

67.    Based on my training, experience, and knowledge of the investigation, and

41

based on the above-referenced call in conjunction with the seizure of cocaine referenced above, your affiant believes the 3.68 kilograms of cocaine seized was being shipped from ███████████ to **TORREN MILLER** for distribution throughout the Rochester and Utica, New York areas. This investigation has revealed that ██████ will typically use UPS to ship cocaine to **MILLER**. After the previous two (2) cocaine interceptions in December 2023, and January 2024, ██████ and **MILLER** have conspired to use names not easily traceable to them in order to ship their narcotics. Your affiant further believes that the shipment of cocaine seized on January 24, 2024 was destined to **MILLER** and that **MILLER** was going to have **MICHAEL DIMARTINO** transport the cocaine to another distributor in Utica, New York. Several lawfully intercepted calls during this investigation have revealed the female the DTO refers to as "Homegirl" is **BRENDA ROPER** operating in the Utica, New York area.

68.    On January 26, 2024, at approximately 12:44 p.m., investigative team members lawfully intercepted a call from ████████████ utilizing **RR-1**, to G.N., utilizing (323) 658-5724 (hereinafter "**GN-1**"). In relevant part, ██████ and G.N. communicate the following:

| | |
|---|---|
| ██████ | Hello? |
| **G.N.:** | Yes. |
| ██████ | Hey, Greg? |
| **G.N.:** | Yeah. |
| ██████ | Can you check on that? I don't want the number. I'll keep the number but can you check on that thing for me? My tracker's off. |
| **G.N.:** | Which one? Yesterday? |

42

███████        Yester [UI]. Yeah.

G.N.:          No. You told me to change the name.

███████        I know but I'm saying I have a tracker on it and the tracker's off or something. Could you look at it for me?

G.N.:          No, no, no, no. That's a different tracking number, man.

███████        No, no, no. Not the tracking number. The tracker.

G.N.:          When did the [UI] the same page. Yesterday you shipped a box.

███████        No, no, no. Greg no, man. What I'm saying, Greg, is that I have something in it and it said that it's off or something. That what I'm saying. It has nothing to do with the tracking number. I just want you to check on it for me.

G.N.:          Check on what? On the…

███████        Yeah, check it for me.

G.N.:          Hold on. Let's start from the beginning. Yesterday you sent a box, right?

███████        Yes, Greg. Yeah.

G.N.:          So, you are trying to track this package?

███████        Yes.

G.N.:          It's not going to work.

███████        It's not?

G.N.:          No. You called me and you said to change the name, right?

███████        Yeah.

G.N.:          So, when I change the name… it's a different tracking number.

███████        I know that, Greg. That's why I'm asking you to look at it for me.

G.N.:          Oh, just [UI] you want.

| | |
|---|---|
| ▆▆▆▆ | Yeah, yeah. The new one. I'm gonna come pick it up later on but I just wanted you to look at it for me. |
| **G.N.:** | Yeah [UI] just said [UI] picked it up. |
| ▆▆▆▆ | He just said he picked it up? |
| **G.N.:** | Yeah, that's all it is gonna say. |
| ▆▆▆▆ | Oh. |
| **G.N.:** | If you want [UI] but you could stop by and I'll give it to you. |
| ▆▆▆▆ | No, what I'm saying is that I have a tracker in the box. |
| **G.N.:** | Yeah. |
| ▆▆▆▆ | That's what I'm saying but it's telling me that it is off. That's why I'm asking you to look at it for me. |
| **G.N.:** | Oh, ok. I see, ok. Let me see. Uh, yesterday… so, it is, yeah, it says near Chino. |
| ▆▆▆▆ | Is it in Encino? |
| **G.N.:** | Chino. Chino. C-H-I-N-O. |
| ▆▆▆▆ | Oh, it's in Chino. |
| **G.N.:** | Yup. |
| ▆▆▆▆ | Chino when? |
| **G.N.:** | At 12:41 was the last time it was scanned. |
| ▆▆▆▆ | Huh? |
| **G.N.:** | 12:41 it was scanned last time. |
| ▆▆▆▆ | Ok. How my tracker is off? |
| **G.N.:** | Yeah, it usually gets to the train and you won't see anything. |
| ▆▆▆▆ | Oh, gets to the train. Alright, ok. Cool, so I'll pick that up later. |

44

**G.N.:**        Alright, no problem.

████████        Ok, cool.

69.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes ██████████ and G.N. are discussing tracking a shipment of cocaine. This investigation has revealed that G.N. is an employee at E&G Mailboxes & Watch Repair in Los Angeles, California and that E&G Mailboxes & Watch Repair offers shipping services through UPS, FedEx, and USPS. Based on the previous HSI seizures of cocaine being shipped via UPS, your affiant is aware that ████████ will typically ship kilogram-sized quantities of cocaine using UPS and FedEx. Your affiant is also aware that contained within the seized shipments were GPS tracking devices, as outlined more within this Affidavit. Based on this information, your affiant believes that ████████ has been and continues to utilize shipping services for his shipments of cocaine, typically containing a GPS tracking device. Your affiant further believes that G.N. is complicit in aiding ████████ with these shipments.

70.    On January 29, 2024, a series of calls between ██████████ **TORREN MILLER,** and ██████████████ were lawfully intercepted by investigative team members. Starting at approximately 12:40 p.m., investigative team members lawfully intercepted a call from ████████████ utilizing **RR-1,** to **TORREN MILLER,** utilizing **Target Telephone 2.** In relevant part, ████████ and **MILLER** communicate the following:

████████        Yo.

**MILLER:**      Yo.

████████        What up?

MILLER:    Shit, shit. I just got back from the store.

██████████    You got the thing?

MILLER:    Yeah, it's all good.

██████████    Alright. So, I'm going to tell you where to go to get the new thing. Alright? So, you can... but don't use to call dude now.

MILLER:    Oh, already know. I didn't do nothing with it yet.

██████████    Yeah, just... just me alone. Don't talk to dude. Nothing like that. So, Ima tell you what to do so we can switch up when, um, [UI] ok?

MILLER:    Alright.

71.    Based on my training, experience, and knowledge of the investigation, your affiant believes the call referenced above reveals ████████████ directing **TORREN MILLER** to acquire a new cellular telephone number. When ████████ tells **MILLER**, "don't use to call dude now", your affiant believes ████████████ is telling **TORREN MILLER** that **MILLER** should not call ████████████ until ████████ gives **MILLER** further instructions.

72.    At approximately 5:07 p.m. on that same date, investigative team members lawfully intercepted a call from ████████████ utilizing **RR-1**, to **TORREN MILLER**, utilizing **Target Telephone 2**. In relevant part, **MILLER** and ████████ communicate the following:

██████████    Hello?

MILLER:    Yeah?

██████████    Yeah, uh, car... car dude is gonna message you for you to meet up [UI]... meet up with him.

MILLER:    Hold on, hold on, hold on. One second, one second...

46

███████        Huh?

**MILLER:**    One second, hold on. Alright, what's up?

███████        I said Big's gonna hit you up on messenger and tell you where to meet up
               with him to get that thing.

**MILLER:**    Alright.

███████        To get that num, alright? So, listen up… for his, for his text… his messenger.
               Alright, cool.

73.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced conversations, your affiant believes ██████████ and **TORREN MILLER** are discussing **MILLER** getting a cellular telephone and that ██████ is telling **MILLER** that ██████████ will arrange a new number for the phone using a messaging application. Your affiant is aware that members of the DTO refer to ██████ as ██████ or ██████ and that ██████ owns and operates an auto shop in Rochester, New York, which coincides with ██████ referencing "car dude" when speaking with **MILLER** about getting a new phone number. Your affiant is also aware that narcotics traffickers and distributors will often switch cellular telephone numbers to evade detection by law enforcement.

74.    At approximately 6:38 p.m. on that same date, investigative team members lawfully intercepted a call from **TORREN MILLER** and ██████████ both utilizing **Target Telephone 2**, to ██████████ utilizing **RR-1**. In relevant part, **MILLER**, ██████ and ██████ communicate the following:

███████        Hello?

**MILLER:**    Yeah, man.

███████    Yo.

███████    Yeah.

███████    I just gave him 6-0. I have 2 left.

███████    Oh, you gave him paper?

███████    Yeah, I gave him paper. What did you think I gave him?

███████    No, I never... I thought, I thought it was the thing you were giving him. But listen, I need [stutters] my line. The line is not good.

███████    Which? I'm, I'm getting a line in the morning. I'll get the number and call you.

███████    No, man. No, listen what I'm saying ███████ alright? The line that you and I were on, right?

███████    Throw that away, man.

███████    No, that then it's this. That's what I'm saying. So, so... that means you were calling other people on it then?

███████    No, no. But, he... he would text me every once in a while. I don't talk to people you know, man? So, throw that away.

███████    Oh, no. But, you shouldn't... but, no. But, you shouldn't be doing that though, brother. If you and I are that, nobody supposed to have it alright? So, I... but I, but it's just thing should go to someone for a new thing. He's going to get it, um, Rue. Car man said he's going to give it to homeboy homeboy in a little bit.

███████    What's that?

███████    So, I'm going to send one line. A new line.

███████    Oh, oh yeah, yeah, yeah. [UI].

███████    Yeah, because... so, so are you still ruing?

███████    How do you mean? I had left him and white boy so he gave me that. So, he said come back and give me the rest. You understand?

48



████████     So, so ok. So, oh, so you gave... you gave Rue 6-0?

████████     Yeah, I gave him 6-0 a while ago, right?

████████     Alright, so let me ask... so, get a new line, man, and by later on home boy supposed to have it from, from car dude and then... you heard?

████████     Alright, alright.

████████     So, tell him that... what time is it? 6, 7, 8? Tell him that I'm going to make home boy come, um, come pick it up in a little while.

████████     Alright, don't say anything.

████████     You heard? Tell him, tell him that dude is coming to pick it up later.

████████     It's his, it's his phone. He's listening to you, man.

████████     Oh, he's listening to you? Alright. Oh, but I never know I was on speaker. Alright, TT. So, I will... I will link with you in a little bit, you heard T? Alright, and I'm going... I'm going to call back Rue to try to hurry up and get that line, too.

**MILLER:**     Yeah.

████████     Alright [UI].

75.     Based on my training, experience, and knowledge of the investigation, and based on the above-referenced conversation, your affiant believes ████████████ ████████████████ and **TORREN MILLER** are conspiring to combine the proceeds of their illegal narcotics sales. When ████████ tells ████████ he gave him "6-0" and that he has "2 left", your affiant believes ████████ is saying he gave **MILLER** $60,000, leaving ████████ with only $2,000 left. Your affiant further believes that ████ ████████ and **MILLER** are discussing getting new cellular telephone numbers to utilize going forward to discuss their narcotics distribution enterprise to evade detection by law enforcement.

49

76.    At approximately 6:42 p.m. on that same date, investigative team members lawfully intercepted a call from ████████████ utilizing **RR-1**, to **TORREN MILLER**, utilizing **Target Telephone 2**. In relevant part, ███████ and **MILLER** communicated the following:

████████    Hey. Hey, T-man.

**MILLER:**    Yo.

████████    Um, so... so him. Damn, man. Come [UI] tell him it was 6, right? In total, right?

**MILLER:**    Yeah, it was [UI] maybe 6.

████████    No, mon. What's I'm sayin'...

**MILLER:**    Oh yeah, yeah, yeah. It was 6.

████████    Right. So, that leave like 40-something, right?

**MILLER:**    I gave him... I gave him 60, man.

████████    Right. So... 60?

**MILLER:**    I get 'em for 4.

████████    Hold up. [counting to himself] 60, ok.

**MILLER:**    I gave 'em 4. There's 2 left.

77.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call between ████████████ and **TORREN MILLER**, your affiant believes ███████ and **MILLER** are discussing **MILLER** giving ████████ a quantity of bulk U.S. currency. Your affiant further believes that when ███████ asks **MILLER** if it was "6 in total", ███████ is referring to $60,000 in U.S currency that **MILLER** gave to ████████

50

78.    Approximately three minutes later on that same date, investigative team members lawfully intercepted a call from **MILLER**, utilizing **Target Telephone 2**, to ▮▮▮▮ utilizing **RR-1**. In relevant part, **MILLER** and ▮▮▮▮ communicate the following:

**MILLER:**    Aight. So, let me put everything securely up and all that.

▮▮▮▮    Yeah, so he… he gonna get there in, like, 2 hours but I need you to get the thing so we can talk, nigga. I can't get to talk to I wanna talk, um…

**MILLER:**    Right, right, right. But, so, I mean [stutters]. SO, I was gonna go… I was gonna, I was gonna do something about the situation but can I take 1 buck out the situation with yo boy so we can buy something real quick?

▮▮▮▮    You… you can take a buck, yeah.

**MILLER:**    Alright, I'll take a buck out the situation real quick.

▮▮▮▮    Alright. I'm gonna hit you up when he…

**MILLER:**    I'll be at the bar right next to my mom's house anyways.

▮▮▮▮    Alright, cool.

79.    Based on my training, experience, and knowledge of the investigation, your affiant believes that ▮▮▮▮ and **TORREN MILLER** are discussing **MILLER** getting a cellular telephone number from ▮▮▮▮ Your affiant further believes that when ▮▮▮▮ tells **MILLER** that he needs **MILLER** to "get the thing so we can talk", ▮▮▮▮ is referring to a new cellular telephone number for **MILLER**.

80.    At approximately 8:59 p.m. on that same date, investigative team members, conducting physical surveillance of **TORREN MILLER** at McGreggor's Bar, located at 2205 Buffalo Road in Rochester, New York, observed a gray-colored 2016 Toyota Camry, bearing New York license plate number LCY7727, park in front of McGreggor's Bar.

Investigative team members then observed **MILLER** exit the front of the business, enter the front, passenger-side of the Toyota Camry, and leave the parking lot. Moments later, investigative team members observed **MILLER** arrive in the Toyota Camry at his residence, located at 284 Colwick Road in Rochester, New York. **MILLER** and the unidentified male were then observed walking into the residence at 284 Colwick Road. Moments later, **MILLER** and the unidentified male were observed exiting the front door of the residence with a bag in the unidentified male's hands. The unidentified male then placed the bag in the trunk of the Toyota Camry before entering the front, driver's-side door and leaving the area.

81.     Based on my training, experience, and knowledge of the investigation, and based on the conversations referenced above, accompanied by the physical surveillance of **TORREN MILLER**, your affiant believes the unidentified male driving the Toyota Camry was meeting with **MILLER** to pick up bulk U.S. currency on ███████████ behalf. Your affiant is aware that drug dealers will typically use trusted sources when transporting their narcotics and/or illicit proceeds. Your affiant also believes that when **MILLER** tells ██████ "I gave him… I gave him 60," **MILLER** is telling ██████ that he has $60,000 in illicit proceeds for ██████ Your affiant further believes that the bag that investigative team members observed being placed in the trunk of the Camry by the unidentified male contained the $60,000 referenced in the call above.

82.     On January 30, 2024, at approximately 1:23 p.m., investigative team members lawfully intercepted a call from **TORREN MILLER**, utilizing **Target Telephone 2**, to ████████████ utilizing **RR-1**. In relevant part, **MILLER** and ██████

52

communicate the following:

███████        Hello?

**MILLER:**        Yeah, I'm at the shop.

███████        You at the shop?

**MILLER:**        He not here… in the back.

███████        You… you saw him?

**MILLER:**        No.

███████        Alright, Ima call him. I'll call you right back.

83.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced conversation, in conjunction with the conversations occurring on January 29, 2024, as referenced above, your affiant believes that **TORREN MILLER** went to ███████ auto shop to receive a new cellular telephone number. Investigative team members, monitoring a GPS vehicle tracker lawfully installed on the 2010 Hyundai Sonata, bearing New York license plate number **HYJ3400** and registered to **MICHAEL DIMARTINO**, observed **DIMARTINO**'s vehicle parked at 484 Lyell Avenue, the address of ███████ auto shop.  Physical surveillance of 484 Lyell Avenue has revealed that both **MILLER** and ███████ continuously use the rear entrance to this shop as opposed to the front entrance.  Your affiant is aware that the January 30, 2024 conversation between **MILLER** and ███████ as referenced above, was the last known contact between **RR-1** and **Target Telephone 2**.

84.    On February 8, 2024, at approximately 2:29 p.m., investigative team members, conducting physical and electronic surveillance, observed **MICHAEL**

DIMARTINO leave 43 Mercer Ave. and drive over to 284 Colwick Rd., a residence of **TORREN MILLER**. **MILLER** was observed entering the rear, passenger-side of the Sonata. After leaving 284 Colwick Rd., **DIMARTINO** and **MILLER** were then observed driving East down the I-90 New York State Thruway toward Syracuse, New York. At approximately 3:58 p.m., electronic surveillance revealed **DIMARTINO** and **MILLER** to be parked in the area of 144 Genesee St. in Auburn, New York, a location known to contain a UPS store. After being briefly parked at 144 Genesee St., **DIMARTINO** and **MILLER** were again observed traveling East down the I-90 Thruway toward Utica, New York. At approximately 5:34 p.m., electronic surveillance placed **DIMARTINO's** 2010 Hyundai Sonata at 1155 Mohawk St. in Utica, New York. This investigation has revealed that **BRENDA ROPER** currently owns a business at 1155 Mohawk St., Suite 4, named "Queens Corridor".

85.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced surveillance, your affiant believes **MICHAEL DIMARTINO** and **TORREN MILLER** received a package of cocaine from the UPS store in Auburn, New York, and transported said package to **BRENDA ROPER** in Utica, New York. This investigation has established a pattern where **DIMARTINO** and **MILLER** will typically receive packages containing cocaine at various UPS and FedEx stores around the Rochester, New York, and Syracuse, New York areas and transport these packages to **BRENDA ROPER** at 1155 Mohawk St., Suite 4 in Utica, New York, otherwise known as "Queens Corridor". This has been evidenced during previous surveillance of DTO members as well as packages of cocaine seized by investigative team members from the

54

DTO during this case.

### March 14, 2024 Seizure of Cocaine from ▮▮▮▮▮▮

86.    On March 14, 2024, FedEx Security from the FedEx Shipping Center, located at 2580 Manitou Road in Rochester, New York, contacted DEA Rochester regarding an opened parcel containing three (3) brick-shaped objects containing a white, powdery substance wrapped in black-colored electrical tape and gift wrapping paper. The parcel, bearing tracking number **272076092066**, was addressed to TABETHA TRAMEL at 1906 Monroe Avenue in Rochester, New York, the location of a FedEx Office Print and Ship Center. The package had a return address of E and G Mailboxes at 357 S. Fairfax Avenue, Los Angeles, California 90036 with a phone number of (323) 658-5724, a telephone number referenced above as **GN-1**. DEA Rochester contacted HSI Rochester, who agreed to take custody of the package as part of the current investigation. A Thermoscientific TruNarc test of the brick-shaped powdery substance returned positive for the presence of cocaine with an approximate weight of 3.27 kilograms. The seized cocaine, the cocaine packaging, and the shipping package are depicted below.



87.    Based on my training, experience, and knowledge of the investigation and based on the above-referenced seizure, your affiant believes that the cocaine seized was shipped to Rochester, New York by ██████████████    During the investigation, investigative team members discovered that ███████ and **TORREN MILLER** will often use female names as the recipients of packages shipped to Rochester, as referenced by the surveillance conducted within this Affidavit.    Your affiant also notes that on January 19, 2024, investigative team members observed **MICHAEL DIMARTINO** driving an unknown female to the a UPS store located at 300 Hylan Drive in Rochester, New York. The female was observed retrieving a package, similar in size and shape to the above-referenced pack seized, from the store and loading the package into the back of **DIMARTINO's** vehicle.    Based on my training, experience, and knowledge of the investigation, and based on the above referenced information, your affiant believes the package seized on March 14, 2024 was shipped by ██████ and intended for members of the DTO in Rochester, New York.

88.    On March 16, 2024, at approximately 8:55 a.m., investigative team members, conducting electronic surveillance, observed **STEPHEN MILLER** leave 152 Genesee Park Blvd. in the 2019 GMC Yukon and drive directly to 633 Post Ave.    At approximately 9:21 a.m., **MILLER** is then observed leaving 633 Post Ave. and driving directly to 115 Oriole St., where **MILLER** remained until approximately 9:54 a.m. before heading back to 633 Post Ave.    At approximately 9:59 a.m., **MILLER** was observed leaving 633 Post Ave. and driving directly to 81 Andy Lane, where he remained for approximately fifteen (15)

minutes, before heading back to 633 Post Ave. At approximately 9:59 a.m., **MILLER** is once again observed leaving 633 Post Ave. and driving directly to 154 Genesee Park Blvd. at approximately 11:31 a.m.

89.     Based on my training, experience, and knowledge of the investigation, and based on the above-referenced surveillance, your affiant believes **STEPHEN MILLER** was transporting narcotics and illicit proceeds between 152 Genesee Park Blvd., 633 Post Ave., 115 Oriole St., and 81 Andy Lane. This investigation has revealed 154 Genesee Park Blvd. to be one of **MILLER's** residences. This investigation has also revealed 633 Post Ave. to be a location where **MILLER** stores and breaks down quantities of cocaine for street level sales at 115 Oriole St. This investigation has further revealed 81 Andy Lane to be the location where **MILLER** stores the illicit proceeds from cocaine sales. Based on the pattern a travel of **MILLER**, as referenced above, your affiant believes **MILLER** travelled from 152 Genesee Park Blvd. to 633 Post Ave. to retrieve a quantity of cocaine and transported that cocaine to 115 Oriole St. for street-level sales. Your affiant further believes **MILLER** took the previous days proceeds from drug sales at 115 Oriole St. and transported said proceeds to 81 Andy Lane.

90.     On March 18, 2024, at approximately 2:00 p.m., investigative team members, utilizing a GPS Ping Order for **Target Telephone 1**, observed **Target Telephone 1** leave the area of the 23594 Park South St. in Calabasas, California, heading south on Highway 101 into the San Fernando Valley area of Los Angeles County. At approximately 2:58 p.m., investigative team members, monitoring electronic surveillance of 357 S. Fairfax Avenue, the location of E&G Mailboxes and Watch Repair in Los Angeles, California, observed the

57

a white-colored Honda SUV, bearing Florida license plate number QLSE24 and registered to **ROXROY ROPER**, arrive and park behind E&G Mailboxes and Watch Repair. ▮▮▮▮▮▮▮▮ was then observed exiting the front, passenger-side of the Honda SUV and entering E&G Mailboxes and Watch Repair through the rear entrance. Moments later, **ROXROY ROPER** was observed exiting driver's-side of the vehicle, opening the trunk of the vehicle, retrieving a brown-colored box from the trunk, similar in size, shape, and color of previously seized shipments of cocaine from ▮▮▮▮▮▮▮ by investigative team members, and carrying the brown-colored box into E&G Mailboxes and Watch Repair. A review of GPS Ping location data for **Target Telephone 1** revealed **Target Telephone 1** to be around E&G Mailboxes and Watch Repair at the time of the electronic surveillance. Approximately twelve minutes later, at 3:10 p.m., ▮▮▮▮▮▮▮ and **ROXROY ROPER** were observed leaving through the rear entrance to E&G Mailboxes and Watch Repair, entering the Honda SUV, and leaving the area.

91. Based on my training, experience, and knowledge of the investigation, and based on the Ping data and surveillance detailed above, your affiant believes ▮▮▮▮▮ ▮▮▮▮ and **ROXROY ROPER** were transporting a quantity of cocaine from to E&G Mailboxes and Watch Repair. Your affiant is aware that the box that investigative team members observed being carried into E&G Mailboxes and Watch Repair by **ROXROY ROPER** appeared similar in size, shape, and color to the packages previously seized by investigative team members during this investigation, as referenced within this Affidavit.

92. On March 30, 2024, at approximately 3:50 p.m., investigative team members, utilizing electronic surveillance, observed **ROXROY ROPER**'s white-colored Honda SUV

pull in and park behind E&G Mailboxes and Watch Repair. **ROXROY ROPER** was observed exiting the front, driver's side of the vehicle and walking inside E&G Mailboxes and Watch Repair through the rear entrance. Moments later, **ROXROY ROPER** was observed exiting the rear entrance to E&G Mailboxes and Watch Repair, opening the back of his vehicle, retrieving a brown-colored box, and handing the box to G.N. at the rear entrance of the building. G.N. and **ROXROY ROPER** are then observed walking back inside E&G Mailboxes and Watch Repair, where **ROXROY ROPER** remained for several minutes.

93.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced surveillance, your affiant believes that **ROXROY ROPER** was delivering a package containing cocaine to E&G Mailboxes and Watch Repair in the. Your affiant is aware that the box that investigative team members observed being carried into E&G Mailboxes and Watch Repair by **ROXROY ROPER** appeared similar in size, shape, and color to the packages previously seized by investigative team members during this investigation, as referenced within this Affidavit.

94.    On March 31, 2024, at approximately 10:43 p.m., investigative team members, monitoring electronic surveillance, observed **MICHAEL DIMARTINO** leave 43 Mercer Ave. and drive directly to 312 6th St. in Rochester, New York, arriving at approximately 10:56 p.m. After approximately two (2) minutes, **DIMARTINO** is observed leaving 312 6th St. and driving East on the I-90 New York State Thruway toward Utica, New York. At approximately 1:11 a.m. the following morning (April 1, 2024), GPS vehicle tracking data showed **DIMARTINO's** 2010 Hyundai Sonata arriving at a Fastrac gas

station, located at 384 N. Genesee St. in Utica, New York, where it remained for approximately thirty (30) minutes before heading West on the I-90 directly back to 43 Mercer Ave.

95.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced surveillance, your affiant believes **MICHAEL DIMARTINO** went to 312 6th St. to receive a quantity of cocaine and then delivered said cocaine to members of the DTO in Utica, New York. This investigation has revealed that 312 6th St. is one of the residences in which ███████████████ resides as well as where ███████ stores cocaine and the illicit proceeds from cocaine sales. Your affiant is aware that drug traffickers will typically utilize the cover of darkness and meet at locations where they will not stand out to law enforcement when conducting their drug business. In this case, your affiant believes **DIMARTINO** was delivering a quantity of cocaine to Utica DTO members late at night at the Fastrac gas station, located at 384 N. Genesee St. in Utica, New York.

96.    On April 2, 2024, at approximately 11:05 a.m., investigative team members, monitoring electronic surveillance, observed **MICHAEL DIMARTINO** leave 43 Mercer Ave. and drive directly to 4716 Dewey Ave. Apartment 4 in Rochester, New York. At approximately 11:15 a.m., **TORREN MILLER** was observed exiting the front door of 4716 Dewey Ave. Apartment 4 wearing a white-colored, hooded sweatshirt, a blue-colored Yankees baseball hat, and carrying a medium-sized, white-colored bag. **MILLER** was then observed entering **DIMARTINO's** 2010 Hyundai Sonata before travelling down toward the I-90 New York State Thruway and eventually East toward Syracuse, New York. At approximately 1:05 p.m., electronic surveillance showed **DIMARTINO's** vehicle parked in

the area of 2362 James St. in Syracuse, New York, the location of a Walgreens Pharmacy that contains a UPS store. After spending approximately eight (8) minutes at this location, the Sonata was then observed travelling East on the I-90 toward Utica, New York, eventually arriving at 1155 Mohawk St. Suite 4 in Utica, New York, at approximately 2:13 p.m. This investigation has revealed that 1155 Mohawk St., Suite 4 is the location of "Queens Corridor", a business belonging to ███████████ ex-wife, **BRENDA ROPER**. Approximately two (2) minutes later, **DIMARTINO's** vehicle is observed leaving 1155 Mohawk St. Suite 4 and heading West to 284 Colwick St. in Rochester, New York, before eventually heading back to 43 Mercer Ave.

97.     Based on my training, experience, and knowledge of the investigation, and based on the above-referenced surveillance, your affiant believes that **TORREN MILLER** and **MICHAEL DIMARTINO** travelled to the UPS store at 2362 James St. in Syracuse, New York, to pick up a package of cocaine shipped by ███████████ Your affiant also believes that **MILLER** and **DIMARTINO** then transported that cocaine to **BRENDA ROPER** in Utica, New York. As referenced in this Affidavit, investigative team members have observed a pattern of behavior where **MILLER** and **DIMARTINO** will receive packages of cocaine at various UPS and FedEx store locations throughout the Rochester, New York, and Syracuse, New York areas and then transport that cocaine to DTO members in Utica, New York, specifically **BRENDA ROPER**.

98.     On April 3, 2024, the Honorable Elizabeth A. Wolford, Chief United States District Judge for the Western District of New York, issued an Order authorizing the interception of wire communications over **Target Telephone 1**, a facility utilized by

▌▌▌▌▌▌▌▌ for a period of thirty (30) days.

99.    On April 4, 2024, at approximately 12:04 p.m., investigative team members lawfully intercepted a call from **TORREN MILLER**, utilizing **Target Telephone 2**, to ▌▌▌▌▌▌ utilizing **Target Telephone 1**. In relevant part, ▌▌▌▌ and **MILLER** communicate the following:

▌▌▌▌    Hello?

**MILLER:**    Yeah.

▌▌▌▌    Hey.

**MILLER:**    Hey, 'member I still gotta, um, this new name still waiting, too.

▌▌▌▌    Yeah, I'm going to pick up a [stutters]… Ima pick up. I'm waiting to pick up somethin' an' then, um, pick up the paperwork today. An' then Ima grab somethin'… so I can put it on.

**MILLER:**    Aight, cool.

▌▌▌▌    Yeah.

**MILLER:**    Mmm.

▌▌▌▌    Cool.

100.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call between ▌▌▌▌▌▌ and **TORREN MILLER**, your affiant believes **MILLER** is telling ▌▌▌ that he has a new name for ▌▌▌ to ship narcotics to in Rochester. As detailed within this Affidavit, the investigation has revealed that ▌▌▌ **MILLER**, and **MICHAEL DIMARTINO** will use a number of different names when receiving packages of narcotics sent by ▌▌▌ During the investigation, investigative team members conducting both physical and electronic

surveillance have observed **MILLER** and **DIMARTINO** transporting different females to UPS and FedEx stores throughout the Rochester, New York area to retrieve packages that match the size, shape, and characteristics of narcotics packages previously seized by investigative team members during this investigation. Your affiant also believes, based on the above-referenced call, that when ███████ says he's going to "pick up the paperwork" and then "grab somethin'", ███████ is referring to picking up U.S. currency and then picking up a quantity of narcotics. Previously intercepted calls between ███████ and **MILLER** have revealed the same verbiage used by both ███████ and **MILLER** when discussing cash and drugs.

101.    On April 4, 2024, at approximately 5:26 p.m., investigative team members lawfully intercepted a call from ███████████████ utilizing **Target Telephone 1**, to ███████ ███████ utilizing NM-2. In relevant part, ███████ and ███████ communicate the following:

███████        Yo.

███████        What's going on, brother?

███████        I'm here. What's going on?

███████        I'm here, man.

███████        Mmhmm. Is everything good?

███████        Mmhmm. It's going to be, like, Tuesday.

███████        Uh huh. 'Cause I'm getting low. Yeah, that's cool then.

███████        Okay. So, Tuesday is a... one less a handful.

███████        That's it?

████    Uh huh. But, but, but I'm supposed to... I'm supposed to be good tomorrow, you know? I'm supposed to... tomorrow I'm supposed to be good as I'm going to get a bunch from the links. So, I'm just waiting. Still keeping my fingers crossed.

████    Aight. Yeah, man. Just let me know.

████    Mmhmm. Yeah, but it's four that's going to be there. Four of them will be there on Tuesday, though.

████    I'm on E.

████    Aight. It's four... it's four that will be there.

████    Aight. Aight.

████    Aight. Mmhmm.

████    Yeah.

102.    Based on my training, experience, and knowledge of the investigation, and based on the above referenced call, your affiant believes ████████ is telling ████ that he will be sending ████ four (4) kilograms of cocaine that following Tuesday. Your affiant also believes that when ████ says "tomorrow I'm supposed to be good" and that he's "going to get a bunch from the links", ████ is stating that he will be resupplied by his cocaine source the following day. Your affiant is aware drug traffickers will commonly use terms like "link" when referring to a source of supply for narcotics.

103.    On April 8, 2024, at approximately 4:20 p.m., investigative team members lawfully intercepted a call from ████████ utilizing **Target Telephone 1**, to **MICHAEL DIMARTINO**, utilizing **MD-2**. In relevant part, ████ and **DIMARTINO** communicate the following:

**DIMARTINO:**    Hello?

██████        [UI] What up?

DIMARTINO:        Hey, what's good?

██████        It's good, man. It's gonna be tomorrow or the day after tomorrow. I'll let you know later on, okay?

DIMARTINO:        Yes! Yes. Perfect. Perfect.

██████        Alright?

DIMARTINO:        Alright. Appreciate you.

██████        Alright, no problem. Cool.

DIMARTINO:        Alright, talk to you.

██████        Mmhmm.

DIMARTINO:        Aight. Bye.

104.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes ██████████ is telling MICHAEL DIMARTINO that a shipment of cocaine will be arriving the next day or the day after that. This investigation has revealed DIMARTINO to be a courier for the DTO. As referenced within this affidavit, ██████ will typically use TORREN MILLER and DIMARTINO to transport cocaine from Rochester, New York to Utica, New York.

105.    On April 9, 2024, at approximately 12:07 p.m., investigative team members lawfully intercepted a call from ██████████ utilizing Target Telephone 1, to ██████████ utilizing AM-3. In relevant part, ██████ and ██████ communicate the following:

██████        Yo?

██████        What's going on, man?

████████    Since when... since when don't you answer your phone?

████████    No, man. You know that... no, you know that when I don't answer the phone, you should know that I'm stressing. No, man. I'm waiting on the thing to bam-bam. It's not... and I had the phone downstairs. So, [laughs] this man said since when I don't I answer the phone. See, that should tell you that I'm not making any money. Why... why I set my phone aside.

████████    Yeah, but... yeah, yeah [stutters]. So, you're saying it's not going to be this week then?

████████    It'll be this week, man, but I'm waiting. It's hasn't... it hasn't touched down yet. So, I'm going to call you.

████████    Alright, alright. I'll be... so it's heavy?

████████    Just... just keep your phone close.

████████    Tell them on the weekend though then? To make it safe?

████████    Alright, cool.

████████    Alright.

████████    Mmhmm.

106.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes ████████████ is telling ████████████ that ██████ is stressed because he is still waiting to be resupplied with a quantity of cocaine. When ██████ says that he doesn't answer the phone when he's "not making any money", your affiant believes ██████ means his supply of cocaine is low and, therefore, he cannot make any profit at the moment. Your affiant also believes that when ██████ asks ██████ if it's "heavy", ██████ is asking if the next shipment of cocaine is going to be a large quantity of cocaine.

66

107. On April 9, 2024, at approximately 2:11 p.m., investigative team members lawfully intercepted a call from ████████████ utilizing **Target Telephone 1**, to **TORREN MILLER**, utilizing **Target Telephone 2**. In relevant part, ████ and **MILLER** communicate the following:

**MILLER:**        Hi? Hello?

████████        Yo, wad up? What's up?

**MILLER:**        Wad up? Hey, what's up?

████████        Ain't nothin'. What's up?

**MILLER:**        [UI], man.

████████        Huh?

**MILLER:**        Tryna chill. This nigga called me this morning so I'll see what up.

████████        Who?

**MILLER:**        ████ had called me looking for you. He said he got ahold of you though.

████████        Oh, yeah. Yeah. Yeah, he called me 'cause I told him I'm waiting for whatever… whatever man. These people fuck me up, man. Um, I should get a call from him any day now that's why I did… I didn't even call you. So, I'm just hoping they call me today.

**MILLER:**        I said we fucked up out here [UI].

████████        … and then I'll hit you up. Huh?

**MILLER:**        Aight, because we fucked up all the way out here.

████████        I know. Yeah, I know. I know.

**MILLER:**        Yeah, man.

████████        Alright?

| | |
|---|---|
| **MILLER:** | Aight [UI]. Alright. |
| ████ | Yeah, alright. |
| **MILLER:** | Alright. |
| ████ | Mm hmm. |

108.    Based on my training, experience, and knowledge of the investigation, and based on the conversations referenced above, your affiant believes ████ and **MILLER** are discussing how ████ has not yet been resupplied with cocaine by his source of supply.   Your affiant also believes that when **MILLER** tells ████ that "████ had called looking for ████ **MILLER** was referring to ████████   This investigation has revealed that ████ is referred to as "████ by members of the DTO, as referenced within this affidavit.   Your affiant further believes that ████ was contacting **MILLER** and looking for ████ because ████ is looking for a resupply of cocaine from ████ as well, as referenced in this Affidavit.   This investigation has revealed that ████ supplies ████ with large quantities of cocaine and that **MILLER** will transport the cocaine to ████ at the direction of ████

109.    On April 10, 2024, at approximately 9:26 a.m., investigative team members lawfully intercepted a call from ████████ utilizing **Target Telephone 1**, to **MICHAEL DIMARTINO**, utilizing **MD-2**.  During this call, ████ tells **DIMARTINO** to go to "the same spot around 12:40" to which **DIMARTINO** replies, "Okay, And then from there, I think it was fifty-four minutes or fifty-five minutes."   Later that day, at approximately 12:49 p.m., investigative team members conducting physical surveillance observed **MICHAEL DIMARTINO** arrive at the FedEx pickup within the Walgreens

Pharmacy, located at 2329 James Street in Syracuse, New York. **DIMARTINO** was then observed entering the store, receiving a package similar in size and shape to packages of cocaine previously seized during the investigation, exiting the store with the package, and placing the package in the trunk of a blue-colored Hyundai Sonata bearing New York license plate HYJ4300, a vehicle registered to **DIMARTINO**. **DIMARTINO** was then observed driving east down the New York State Thruway and arriving at 1155 Mohawk Street in Utica, New York. At approximately 2:04 p.m., Investigative team members conducting surveillance at 1155 Mohawk Street then observed **DIMARTINO** arrive at 1155 Mohawk Street. At that same time, investigative team members also observed **BRENDA ROPER** arrive in a red-colored Audi A6, bearing New York State license plate number GEM8011 and registered to **BRENDA ROPER** at 367 Dutch Hill Road in Frankfort, New York, and park in the parking lot at 1155 Mohawk Street. **DIMARTINO** was then observed retrieving the package from the trunk of his vehicle and placing the package in the rear seat of **ROPER's** red-colored Audi A6 before entering **ROPER's** vehicle through the front, passenger-side door. After approximately two minutes, **DIMARTINO** was then observed exiting **ROPER's** vehicle, entering his own vehicle, and leaving the area. **ROPER** was then observed taking the package from the back seat of the red-colored Audi A6 into a store, identified as "Queens Corridor" at 1155 Mohawk Street, Suite 4, Utica, New York.

110.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced surveillance conducted by investigative team members, your affiant believes **MICHAEL DIMARTINO** was delivering a quantity of cocaine to **BRENDA ROPER**, the ex-wife of ▪▪▪▪▪▪▪▪▪▪ The package **DIMARTINO**

received in Syracuse, New York, matched the size, shape, and physical characteristics of previously seized packages of cocaine sent by ███████████ to **DIMARTINO** and **TORREN MILLER**. As referenced within this affidavit, this investigation has revealed **DIMARTINO** to be a courier of narcotics for ███████████ Numerous surveillance operations have observed **DIMARTINO** receiving similar packages at various UPS and FedEx stores around the Rochester, New York area and delivering said packages to Utica, New York. Your affiant also believes **BRENDA ROPER** is conspiring with ███████ ████ to distribute cocaine in the Utica, New York area.

111. On April 10, 2024, at approximately 4:40 p.m., investigative team members lawfully intercepted a call from ███████████ utilizing **Target Telephone 1**, to **TORREN MILLER**, utilizing **Target Telephone 2**. In relevant part, ████ and **MILLER** communicate the following:

**MILLER:**    Yo.

███████    Yo.

**MILLER:**    Yep.

███████    Yeah, who can I use?

**MILLER:**    Huh?

███████    Who can I use?

**MILLER:**    Um, it's either... it's either me, Melissa, of this new name Tammy.

███████    Um, Tammy is, um, she... she. Who is she?

**MILLER:**    That's Melissa's mom.

███████    Oh, so she's good?

70

MILLER:    Yeah, yeah. I already had... I already met with her, talked to her. Everything. They been waiting.

▮▮▮▮    You... you 100 percent, bro?

MILLER:    I'm 1,000 percent.

▮▮▮▮    Okay. What's her name?

MILLER:    Aight, I'm about to go... I'm about to tell her to spell it and then Ima give it. Let me call you right back.

▮▮▮▮    And then, um, and then tomorrow... and then tomorrow Ima do one for you tomorrow. Another one for you tomorrow.

MILLER:    That gotta be for me. I'm zero.

▮▮▮▮    Aight, Ima do one for you tomorr... listen, don't worry. It's going to be... it's goin'. Do you remember the other day it was, a lot of stuff going on?

MILLER:    Yeah, I remember.

▮▮▮▮    It's gonna... it's gonna be back like that, so just gear up yourself. Just get as many people as you can.

MILLER:    Aight. Let me go get this name and everything for you.

▮▮▮▮    Alright, so let me get... let me get that lady's name.

MILLER:    Ima go get that name for you and spell it out for you. Let me get you right back.

▮▮▮▮    Okay.

MILLER:    Yeah.

▮▮▮▮    Mmhmm.

112.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes ▮▮▮▮ utilizing **Target Telephone 1**, and **MILLER**, utilizing **Target Telephone 2**, are discussing using a woman

named "Tammy" to be the recipient of an incoming shipment of cocaine from ███ to

**MILLER**. This investigation has revealed ███ and **MILLER** will use several different

individuals' names as recipients of cocaine packages sent from ███ to Rochester, New

York. Your affiant also believes that when ███ tells **MILLER** to "gear yourself up"

and to "get as many people as you can", ███ is indicating that he wants **MILLER** to

solicit numerous individuals to be used as recipients for these narcotics packages. Your

affiant further believes that when **MILLER** says he's "zero", **MILLER** is indicating that his

supply of cocaine is gone and that he needs to be resupplied by ███

    113.   Approximately five (5) minutes later, at 4:45 p.m., investigative team

members lawfully intercepted a call from **TORREN MILLER**, utilizing **Target Telephone**

**2**, to ███████ utilizing **Target Telephone 1**. In relevant part, **MILLER** and

███ communicate the following:

| | |
|---|---|
| ███ | Hello? |
| **MILLER:** | Aight. So, the lady, uh, so the lady Tammy was saying that she gets out at, um… anything past twelve o'clock she can do. So… |
| ███ | Yeah, man. Tor, yeah. It's gon' be… it's gon' be… yeah. |
| **MILLER:** | Aight, so let's do it. Let's bust out. That's a new one for us. Let's bust out. |
| ███ | Yeah, what's her name? |
| **MILLER:** | Aight, let me tell you how to spell it. Hold on, I got it written down. |
| ███ | [sniffles] |
| **MILLER:** | Aight, so the first name is Tammy. As in T-A-M-M-Y. |
| ███ | Hold on one second for me. Um, okay so… |
| **MILLER:** | First name T… |

72

██████        … T-A-M-M-Y.

**MILLER:**    There it go. T-A-M-M-Y. The last name is Gra…

██████        Mmhmm.

**MILLER:**    Gra… Gra… Grabowski. So, it's G-R-A-B-O-W-S-K-I.

██████        Okay.

**MILLER:**    Now, tell me what you got in there.

██████        Okay, Tammy G-R-A…

**MILLER:**    Yeah.

██████        … B-O-W-S-K-I.

**MILLER:**    Yeah, Grabowski. Yeah, Grabowski. Whatever it's Grabowski.

██████        Okay?

**MILLER:**    Yeah. Yup.

██████        Aight.

**MILLER:**    Sweet. And that's, an, that's a whole move right there. A whole different look an' everything.

██████        Okay, right. That's what I'm saying.

**MILLER:**    I got a bunch a shit, boy. I got a bunch a shit. Mmhmm.

██████        Aight. Just get, aight, just get… just get them going 'cause we gon' need them.

**MILLER:**    Well, aight nigga. I got it, bro.

██████        AIght?

**MILLER:**    Yeah, yeah so…

██████        Aight, cool.

**MILLER:**    … so, we gon' be on the lookout for it.

73

███████    Aight.

**MILLER:**    Aight.

114.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced conversation, your affiant believes ███████ is utilizing **Target Telephone 1** to coordinate a shipment of cocaine to **MILLER**.  Your affiant also believes that ███████ is going to use the name "Tammy Grabowski" as the recipient listed on the shipping label of a package of cocaine being sent to **MILLER** in Rochester, New York.  This investigation has revealed that the DTO will commonly use different names on shipping labels of narcotics as a means to evade detection by law enforcement.  Your affiant further believes that when **MILLER** says "we gon' be on the lookout for it", **MILLER** is telling ███████ he will be looking for the above-referenced shipment of cocaine after ███████ ships it.

115.    On April 11, 2024, at approximately 2:31 p.m., investigative team members lawfully intercepted a call from ██████████████ utilizing **Target Telephone 1**, to **TORREN MILLER**, utilizing **Target Telephone 2**.  In relevant part, ███████ and **MILLER** communicate the following:

**MILLER:**    Yo.

███████    Hey, you wanna go to [stammers] the pharmacy in Brockport or do you want to go to, um… um… the brown people down, down in your town? Which would you rather?

**MILLER:**    Um, mmm, let's try my town.

███████    Try your town?

**MILLER:**    Yeah.

|  | Aight. |
|---|---|
| **MILLER:** | The reason I say, well… well, um, actually… actually no, no, no, no, no. We in the greens in Brockport so try that. |
|  | The what? |
| **MILLER:** | It was the greens for Brock, right? |
|  | The gree… yeah, yeah. |
| **MILLER:** | Yeah, try that [UI]. |
|  | [UI] you want the greens for the grot… for Brock? |
| **MILLER:** | Yeah, yeah, yeah let's do it. |
|  | Ok, you like that one? |
| **MILLER:** | Yeah, yeah. |
|  | Okay. Alright, cool. |
| **MILLER:** | Yep, yep. |
|  | Mmhmm. Alright, alright. |
| **MILLER:** | Aight. |
|  | Mmhmm. |

116.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes ████ is utilizing **Target Telephone 1** to arrange a location for ████ to ship a quantity of cocaine.  When ████ asks **MILLER** if he wants to use "the greens" or the "brown people", your affiant believes ████ is asking **MILLER** if **MILLER** prefers receiving a package at the FedEx store located within a Walgreens pharmacy located at 73 N. Main Street in Brockport, New York or at a UPS store at another location.  This investigation has revealed that the term

"green" refers to FedEx at Walgreens and "brown people" refers to UPS, both parcel carriers with which ▮▮▮▮ ships quantities of cocaine to Rochester, New York, as evidenced by the cocaine seizures referenced within this Affidavit. Prior physical surveillance by investigative team members early in the investigation revealed **MICHAEL DIMARTINO** and **TORREN MILLER** receiving a package of, what is believed to be cocaine, at the Walgreens located at 73 N. Main Street in Brockport, New York. Your affiant believes that location is the same location ▮▮▮▮ and **MILLER** discuss in the call above.

117.    Approximately thirty-five (35) minutes later, at 3:06 p.m., investigative team members, monitoring electronic surveillance of E&G Mailboxes and Watch Repair, observed **ROXROY ROPER's** white-colored Honda SUV arrive and park behind E&G Mailboxes and Watch Repair. Investigative team members then observed ▮▮▮▮ ▮▮▮▮ exit the front, passenger-side of the vehicle and enter E&G Mailboxes and Watch Repair through the rear entrance. Approximately thirteen (13) minutes later, G.N. was observed carrying a box from the area of **ROXROY ROPER's** vehicle into the rear of the business, followed by ▮▮▮▮ and **ROXROY ROPER**, each carrying a box respectively. At approximately 3:29 p.m., ▮▮▮▮ and **ROXROY ROPER** were then observed exiting E&G Mailboxes and Watch Repair, entering the white-colored Honda SUV, and leaving the area.

118.    On April 11, 2024, at approximately 4:17 p.m., investigative team members lawfully intercepted a call from ▮▮▮▮ utilizing **NM-2**, to ▮▮▮▮

utilizing **Target Telephone 1**. In relevant part, ▮▮▮▮ and ▮▮▮▮ communicate the following:



| ▮▮▮▮ | What's going on brother? What's going on big brother? |

▮▮▮▮    You're on some joking around type thing.

▮▮▮▮    No, man. Please listen, man. The men… man, I'm messed up. Those guys messed me up, teacher.

▮▮▮▮    [chuckles]

▮▮▮▮    I was… I was waiting on the connect to straighten me out, but he has straightened me out, man. So, we're going to be good… we're going to be good… we're going to be good this week. Like, Tuesday, Wednesday we'll be good.

▮▮▮▮    Next week?

▮▮▮▮    Yeah.

▮▮▮▮    Alright.

▮▮▮▮    'Cause I… 'cause you know I'm not going the fast way. So, I, I got it and pushed it already, so, whatever. [stutters] What number, um, uh… how many did you want? Like ten?

▮▮▮▮    What do you mean?

▮▮▮▮    What did you say for ten?

▮▮▮▮    I don't know? Do you want ten?

▮▮▮▮    Yeah.

▮▮▮▮    No, man. You're not getting ten. Talking about "yeah".

▮▮▮▮    Yeah! Yeah, man [UI].

▮▮▮▮    You're not getting ten.

▮▮▮▮    Yeah, man. I'll take ten straight up, man. Right now. Or twenty.

███████    You're trying to get back. You're trying to get me going, huh? Oh my God. I have some, I have some… I have a whole lot of people ordering. Even ██████ has been calling me. That's why… that's why I asked you how many you want so I can know how to… how to, um…

███████    No, man. I'd take about… I mean, shit. That's how my thing is anyways. I'll take ten. I don't care.

119.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, combined with the above-referenced surveillance, your affiant believes ██████ and ██████ are discussing ██████ sending ██████ 10 kilograms of cocaine. Your affiant also believes that the ten (10) kilograms ██████ and ██████ are speaking of were contained within the three (3) boxes that ██████████ ROXROY ROPER, and G.N. were carrying into E&G Mailboxes and watch Repair that same day. Your affiant further believes that when ██████ says, "Even ██████ calling me", ██████ is indicating that ██████████ has been inquiring about being supplied with a quantity of cocaine by ██████ Your affiant is aware that this investigation has revealed that members of the DTO commonly refer to ███████████ as "██████

120.    On April 15, 2024, at approximately 10:39 a.m., investigative team members lawfully intercepted a call from ██████████ utilizing **Target Telephone 1**, to ██████ ██████ utilizing **NM-2**. In relevant part, ██████ and ██████ communicate the following:

███████    Let me see. It's not… it's not homeboy tomorrow. It's Torren tomorrow. It's Torren tomorrow. It will be him and a girl. It's Torren tomorrow. It's the next guy will Torren the next time. Shit, I thought… I thought it was the white guy. It's Torren tomorrow.

███████    Oh, so…

████████  He's the one you will see. It's Torren that you will see. He will just give you the thing... the box, and that's it. And, you just give him... just give him the $4 for me and that's it.

████████  Alright.

████████  The four hundred dollars and that's it.

████████  Alright, alright.

████████  Mmhmm. [UI] alright, cool. Mmhmm.

121.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced conversation, your affiant believes ████ and ████ are discussing **TORREN MILLER** delivering a quantity of cocaine to ████ in exchange for $400 for **MILLER's** services. This investigation has revealed ████ will typically pay **MILLER** approximately $400 for every delivery that **MILLER** makes to other distributors. Your affiant also believes that ████ and ████ are discussing a shipment of cocaine because ████ typically ships cocaine in brown, cardboard boxes, as evidenced in this Affidavit during previous seizures by investigative team members.

122.    On April 15, 2024, at approximately 4:35 p.m., investigative team members lawfully intercepted a call from ████████ utilizing **Target Telephone 1**, to **TORREN MILLER**, utilizing **Target Telephone 2**. In relevant part, ████ and **MILLER** communicate the following:

████████  Yo.

**MILLER:**    Yeah?

████████  Yeah. So, tomorrow, um, you'll see Big, alright?

**MILLER:**    Aight.

██████    Are you hearing me?

**MILLER:**    Yep.

██████    And then Wednesday you'll see ██████

**MILLER:**    Aight.

██████    So, it's gonna be the Tammy… the Tammy lady to tomorrow.

**MILLER:**    Um, I ain't hear the last part.

██████    Huh? It's going to be the Tammy…

**MILLER:**    Oh, yeah.

██████    It's going to be the Tammy lady tomorrow and then Wednesday it's you. So, so when it [stutters] tomorrow you'll see Big and Wednesday you'll see Beb.

**MILLER:**    Alright.

123.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes ██████ is informing **MILLER** that a package of cocaine is arriving in Rochester the next day and it will be addressed to Tammy Grabowski. As referenced within this Affidavit, Tammy Grabowski was identified as a previous recipient of a package sent by ██████ to Rochester, New York. Your affiant is aware that the DTO will commonly use names not closely associated with DTO members when shipping packages of cocaine. Your affiant also believes, based on the call above, that ██████ is advising **MILLER** that the shipment coming on Tuesday should be delivered to ████████ and the package arriving Wednesday should be delivered to ██████ ████████ This investigation has revealed that DTO members refer to ██████ as ██████ or ██████ and ████████ as " ██████

124.    On April 16, 2024, at approximately 11:57 a.m., investigative team members lawfully intercepted a call from ███████████ utilizing **Target Telephone 1**, to **TORREN MILLER**, utilizing **Target Telephone 2**.    In relevant part, ███████ and ███████ communicate the following:

**MILLER:**    Yeah.

███████    Yeah, it's there.

**MILLER:**    Aight. Where?

███████    Um, Highland.

**MILLER:**    Aight.

███████    Hmm?

**MILLER:**    Aight. I'm about to be on my way.

███████    And then, remember ███████ is going to, um… so, I'm gonna call him.

**MILLER:**    Yup. Get him linked up.

███████    Alright? Ima call him now.

**MILLER:**    Yeah.

125.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes ███████ is telling **MILLER** that a package of cocaine has arrived at the UPS store located at 300 Hylan Drive in Rochester, New York.  Your affiant also believes that when ███████ says he's going to call ███████, ███████ is referring to ███████████  This investigation has revealed that members of the DTO refer to ███████ as ███████ or ███████, as referenced within this affidavit.

126.    Following lawful interception of the call referenced on April 16, 2024, investigative team members set up surveillance at the UPS store located at 300 Hylan Drive in Rochester, New York.    At approximately 12:53 p.m., investigative team members, monitoring a pole camera overlooking 4716 Dewey Avenue in Greece, New York, observed **TORREN MILLER** enter the passenger-side of a blue-colored Chevrolet Impala, bearing New York license plate number LJF7416 and registered to Melissa Hamilton at 7 Salter Place in Rochester, New York, before the Chevrolet Impala left the area.    At approximately 1:17 p.m., investigative team members conducting physical surveillance, observed the blue-colored Chevrolet Impala arrive at the UPS store at 300 Hylan Drive.    Melissa Hamilton was then observed approaching a red-colored Toyota Rav 4 SUV, bearing New York license plate number KCG8900 and registered to Tammy Grabowski at 724 Gasberry Lane in Webster, New York.    Tammy Grabowski was then observed exiting the red-colored Toyota Rav 4 and walking into the UPS store with HAMILTON.    Moments later, HAMILTON and GRABOWSKI exit the UPS store with a large, brown-colored box.    HAMILTON was then observed placing the box in the back seat of the blue-colored Chevrolet Impala before leaving the area with **MILLER**.    At approximately 1:41 p.m., investigative team members conducting surveillance at Cobbs Hill Park in Rochester, New York, observed ███████ ███████ arrive in a dark-colored Honda Accord bearing New York license plate number LCJ6270, and park near the basketball court.    At that time, investigative team members lawfully intercepted a call from **TORREN MILLER**, utilizing **Target Telephone 2**, to ███████████ utilizing **Target Telephone 1**.    In this call, ███████ asks **MILLER**, "Did you see him?", to which **MILLER** replies, "Te… Tell him I'm in a bl… blue Impala.

I'm pulling in. Tell him... he, he knows where the basketball court at. Tell him Ima park by the [UI]." Minutes later, investigative team members observed **MILLER** and HAMILTON pull up next to ▮▮▮▮▮ vehicle. **MILLER** was then observed retrieving the package from the back seat of the Impala and handing the package to ▮▮▮▮▮ through ▮▮▮▮▮ driver's-side window. ▮▮▮▮▮ was then observed handing what appeared to be U.S. currency to **MILLER** in exchange for the package. After a few moments, ▮▮▮▮▮ **MILLER**, and HAMILTON all leave Cobbs Hill Park in their respective vehicles.

127. Based on my training, experience, and knowledge of the investigation, and based on the calls and surveillance on April 16, 2024, your affiant believes **MILLER** and **HAMILTON** were delivering a quantity of cocaine to ▮▮▮▮▮ at the direction of ▮▮▮▮▮ Your affiant is aware that the appearance and dimensions of the package retrieved by HAMILTON and GRABOWSKI at the UPS store on Hylan Drive matches previous seizures of cocaine during this investigation. Your affiant also believes that the call referenced above where ▮▮▮▮▮ mentions he's going to call ▮▮▮▮▮ refers to ▮▮▮▮▮ telling ▮▮▮▮▮ when and where to meet **MILLER** to retrieve the package.

128. On April 16, 2024, at approximately 1:52 p.m., investigative team members lawfully intercepted a call from ▮▮▮▮▮ utilizing **Target Telephone 1**, to ▮▮▮▮▮ utilizing **AM-4**. In relevant part, ▮▮▮▮▮ and ▮▮▮▮▮ communicate the following:

▮▮▮▮▮    Yo.

▮▮▮▮▮    Yo?

▮▮▮▮▮    Mmhmm.



███████  Aight, I just, um, confirmed and spoke to the people. It will be tomorrow. But, I am going to tell you right now before I even come over to that side, bro... I can't go under fourteen-five. I am telling you right now. The people will not go down with the number because they said too much is owed. So, I can't go down.

███████  So, you can't do fourteen?

███████  Too much where I can't... where I'm not making any money out of the thing because I have to pay all this money to get it over there. I have to pay to pay to get back the thing over here to the people and I am not making anything on the thing really. So, I can't go under fourteen-five because they will not come off their number.

███████  Alright, aight. I... I thought you were going to charge me fourteen but it's alright.
███████  Huh?

███████  I thought you were going to charge me fourteen but it's alright [UI].

███████  No, I can't, I can't make it four... because they are not coming off the number 'cause they are saying too much is owed and I have to be paying them. I have to be paying them.

███████  Aight. When is it? Will it be in... is it sooner or later?

███████  No, tomorrow.

███████  Aight, I will [UI].

███████  Yeah, tomorrow and then it will... it will be an, um, eight cents and then...

███████  Aight, man.

129.   Based on my training, experience, and knowledge of the investigation, and based on the call referenced above, your affiant believes ██████ and ████████ are discussing ████████ sending ████████ a quantity of cocaine. When ██████ tells ████████ he "can't go below fourteen-five", your affiant believes ██████ is telling ████████ he can't sell the cocaine for anything less than $14,500 per kilogram. This

84

investigation has revealed ▮▮▮▮ typically sells cocaine to DTO members in Rochester for between $14,000 and $15,000 per kilogram. Your affiant also believes that when ▮▮▮▮ says it will be "eight cents", ▮▮▮▮ is referring to eight (8) kilograms of cocaine that he will be sending to ▮▮▮▮ Your affiant is aware that drug traffickers will typically use coded wording when discussing their drug trafficking business. Based on your affiants training and experience, your affiant believes that "eight cents" actually refers to eight (8) kilograms of cocaine.

130. On April 15, 2024, investigative team members were advised by FedEx that a package addressed to **TORREN MILLER** was destined for the FedEx store located at 73 N. Main Street in Brockport, New York. FedEx informed investigative team members that a FedEx package, weighing approximately 26 pounds and addressed to **TORREN MILLER at 73 N. Main Street in Brockport, New York**, was scheduled to arrive at the FedEx sort facility, located at 225 Thruway Park Drive, West Henrietta, New York 14586, the morning of Wednesday, April 17, 2024.

131. On April 17, 2024, at approximately 7:15 a.m., investigative team members detained the above-referenced package at the FedEx sort facility, located at 225 Thruway Park Drive, West Henrietta, New York 14586, in anticipation of a federal search warrant. At approximately 9:45 a.m., the Honorable Mark W. Pedersen, United States Magistrate Judge for the Western District of New York, signed an Order authorizing a search and seizure of the above-referenced package addressed to **TORREN MILLER**. A search of the package revealed approximately 8.7 kilograms of cocaine and a GPS tracking device. The seized cocaine and the shipping package are depicted below.



132.    On April 17, 2024, at approximately 11:26 a.m., investigative team members lawfully intercepted a call from ███████████ utilizing **Target Telephone 1**, to **TORREN MILLER**, utilizing **Target Telephone 2**.   In relevant part, ███████ and **MILLER** communicate the following:

**MILLER:**    Huh?

███████    Look like the people took... took away the stuff.

**MILLER:**    Hey?

███████    Did you hear me?

**MILLER:**    Yeah, I'm listening to you.

███████    Yeah, it looks like they took it. It was out and then it went back to the... to the spot, so... and then it says "Exception". But it's not showing me anything else and then the track thing is, like, I can't get to ping it. So, I don't know if it's because it's inside the building and it doesn't have any service. But, it's not pinging.

**MILLER:**    Mmhmm.

██████ So, It's like I'm gonna have to shut down the... I'm gonna have to shut down the, the X-people because it's the X.

MILLER: Yeah [UI].

██████ I don't think I can use [UI] or, like I said, I can't keep... and that's why I was telling you, man. I can't keep... keep doing [sic] thing in the ROC. The ROC is getting, like, it's getting hot over there.

MILLER: Mmhmm.

133.    Based on my training, experience, and knowledge of the investigation, and based on the seized package and phone call referenced above, your affiant believes ████████████ was shipping the seized cocaine to **TORREN MILLER** and that ██████ utilizing **Target Telephone 1**, called **MILLER** to let **MILLER** know that the package may have been seized or lost.  Your affiant is aware that ██████ will commonly use the term "X" if he is shipping FedEx and "brown people" if he is shipping UPS.  Based on this information and based on the cocaine seizure referenced above being seized from FedEx and ██████ saying he's going to have to shut down the "X-people", your affiant believes ██████ was referring to the cocaine seized on April 17, 2024.

134.    On April 19, 2024, investigative team members were contacted by FedEx regarding a 26 pound package shipped from E & G Shipping in Los Angeles, California, addressed to MELISSA HAMILTON at 4433 Dewey Avenue in Rochester, New York. FedEx informed investigative team members that the parcel was scheduled for delivery in Rochester, New York on Tuesday, April 23, 2023 and would be held by members of FedEx at the FedEx sort facility located at 7020 Van Buren Road, Syracuse, NY 13209.

135.    On April 22, 2024, at approximately 11:03 a.m., the Honorable Mitchel J. Katz, United States Magistrate Judge for the Northern District of New York, signed an

Order authorizing the search and seizure of the above-referenced package addressed to **MELISSA HAMILTON**. A search of the package revealed approximately eight (8) kilograms of cocaine. The seized cocaine and shipping package are pictured below.



136. Based on my training, experience, and knowledge of the investigation, and based on the seizure referenced above, your affiant believes that ████████████ shipped the cocaine seized above to MELISSA HAMILTON. This investigation has identified HAMILTON as a driver for **TORREN MILLER**. Physical and electronic surveillance by investigative team members has revealed HAMILTON will occasionally receive packages of cocaine in her name at FedEx and UPS stores and then drive **MILLER** and the cocaine to Utica, New York, at the request of ████████.

137. On April 22, 2024, at approximately 11:43 a.m., investigative team members monitoring electronic surveillance, observed **MICHAEL DIMARTINO's** 2010 Hyundai Sonata to be located near the UPS store located at 3896 Dewey Avenue in Rochester, New York. Investigative team members immediately initiated physical surveillance of **DIMARTINO** at the UPS store. At approximately 11:51 a.m., investigative team members observed Amanda Stroller exit the Auto Zone, located in the same plaza as the UPS store, and approach the Sonata. Moments later, STROLLER was observed walking into the UPS

store where she remained for approximately two (2) minutes before exiting the with a brown-colored package. STROLLER was then observed walking back to the Sonata when **DIMARTINO** exited the driver's side and opened the trunk of the vehicle. STROLLER was then observed placing the package in the trunk of the Sonata before **DIMARTINO** left the area.

138.    At approximately 11:54 a.m., investigative team members lawfully intercepted a call from ██████████ utilizing **Target Telephone 1**, to ██████ ██████ utilizing **AM-4**. In this conversation, ██████ asks ██████ "Where do you want them to go?", to which ██████ replies, "Just tell him to come to Brooks and, as soon as you pass the gas station, he'll see me." ██████ is then heard saying to **DIMARTINO** in the background, "He says come to Brooks and, as soon as you pass the gas station, you're gonna see him." At approximately 12:14 p.m. that same day, investigative team members observed **DIMARTINO** arrive at the Mobil gas station located at 671 Brooks Avenue in Rochester, New York, in the Sonata. **DIMARTINO** proceeded to drive past the gas station followed closely by ██████ Both ██████ and **DIMARTINO** were then observed briefly stopping next to each other on Genesee Park Boulevard, just west of Thurston Street, before separating.

139.    Approximately five (5) minutes later, ██████ was observed parking in the driveway of 152/154 Genesee Park Boulevard. Investigative team members, utilizing electronic surveillance of 152/154 Genesee Park Blvd., then observed ██████ exit his vehicle, open the rear, driver's-side door, retrieve a brown-colored box consistent with the size and shape of the box given to **DIMARTINO** by STROLLER at the UPS store earlier

89

that day, and take the box directly into 152 Genesee Park Blvd., the known residence of **STEPHEN MILLER**. At approximately 1:33 p.m., ███████ was observed exiting the rear of 152/154 Genesee Park Blvd. carrying a brown-colored bag and placing the bag in the front seat of the Edge. At that same time, **STEPHEN MILLER** was observed exiting the front door of 154 Genesee Park Blvd. and briefly conversing with ███████ in the driveway before ███████ left the area..

140. Based on my training, experience, and knowledge of the investigation, and based on the above-referenced conversation, in conjunction with the above-referenced calls, combined with the above-referenced surveillance, your affiant believes ███████████ was delivering the cocaine, sent by ███████████ and delivered to ███████ by **MICHAEL DIMARTINO**, to **STEPHEN MILLER** at 154 Genesee Park Blvd. Your affiant also believes that the brown-colored bag ███████ was observed carrying out of 152/154 Genesee Park Blvd. contained a quantity of U.S. currency, paid to ███████ by **MILLER**, in exchange for a quantity of cocaine.

141. On April 22, 2024, at approximately 10:20 a.m., investigative team members lawfully intercepted a call from ███████████ utilizing **Target Telephone 1**, to ███████████ utilizing **AM-4**. In this call, ███████ says, "Alright, he has touched down. So, he's going to pick it up... he's going to pick up his mother and then come by, okay?", to which ███████ asks, "It's Tori that'll be coming?" ███████ then says, "Yes, it's Tori." Later in the conversation, ███████ tells ███████████ "He just got up. So, he's going to pick... and then he's going to come. So, probably it's going to be, like, in a half an hour time or forty minutes." Later in the morning, at approximately 11:32 a.m.,

investigative team members lawfully intercepted another call from ████████████ utilizing **Target Telephone 1**, to ████████████ utilizing **AM-4**.    In this conversation, ██████ tells ████████ "He's gonna call you. He's on his way, okay?", to which ████████ replies, "Alright, alright." ████████ then asks, "Um, what... how much are you going to need out of it?", to which ████████ replies, "I don't know. Pro... how much do you have?" ████████ then says, "One more. One extra on it than... last time."

142.    Approximately twenty minutes later, at 11:52 a.m., investigative team members monitoring electronic video surveillance, observed **TORREN MILLER** and **HAMILTON** arrive at 312 6th St. in a blue-colored Chevrolet Impala, bearing New York license plate number LJF7416 and registered to Latisha Johnson at 7 Salter Place in Rochester, New York.  Approximately six minutes later, at 11:58 a.m., investigative team members observed ████████ arrive at 312 6th St. ████████ and **MILLER** were then observed moving around between the two vehicles for approximately two minutes before both ████████ and **MILLER/HAMILTON** departed the driveway of 312 6th St. in their respective vehicles.  At approximately 12:47 p.m., investigative team members monitoring electronic video surveillance, observed ████████████ arrive at 152/154 Genesee Park Blvd. and park in the driveway. ████████ was then observed retrieving a red-colored grocery bag out of the rear, driver's-side seat and walking into 152 Genesee Park Blvd.

143.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced calls, in conjunction with the above-referenced surveillance, your affiant believes that ████████████ and ████████████ were arranging for ████████ to receive a quantity of cocaine from **TORREN MILLER** and **HAMILTON** at

312 6th St. This investigation has revealed the address at 312 6th St. to be a location in which ▮▮▮▮▮ resides and stores quantities of cocaine. Your affiant also believes that, after receiving a quantity of cocaine from **TORREN MILLER**, ▮▮▮▮▮ then transported a portion of that cocaine to **STEPHEN MILLER** at 152 Genesee Park Blvd. Your affiant is aware that the address at 152 Genesee Park Blvd. is the known residence of **STEPHEN MILLER**. Your affiant is also aware that ▮▮▮▮▮ was identified early in this investigation as a source of supply of cocaine for **STEPHEN MILLER**.

144.    On April 25, 2024, at approximately 12:43 p.m., investigative team members lawfully intercepted a call from ▮▮▮▮▮ utilizing **Target Telephone 1**, to ▮▮▮▮▮ utilizing **AM-4**. In relevant part, ▮▮▮▮▮ and ▮▮▮▮▮ communicate the following:

▮▮▮▮▮    What's going on, father?

▮▮▮▮▮    Yo. No, I was just checking on you.

▮▮▮▮▮    Boy, it's the same bullshit with the thing nigga. Pa...

▮▮▮▮▮    They took it away?

▮▮▮▮▮    I don't even know. It's just saying, um, "delay, running late".

▮▮▮▮▮    Oh, Lord.

▮▮▮▮▮    Mmhmm. It has not even reached up at your side yet. It's down at... down at Syracuse side. It's at... but, I don't understand why they would've fucked with it down there.

▮▮▮▮▮    [Groans]

▮▮▮▮▮    'Cause normally it... normally when it comes, it comes and it says, um, the facility inside of Syracuse and then it leaves from Syracuse and comes to you. But, it is at a place called "Geddes Town" and it has... it's saying, um, "running late Geddes Town" but...

███████    Oh.

███████    … and Geddes Town is, like, eleven minutes out of Syracuse.

███████    Oh. Well, I don't know what…

███████    … I don't know if it's a transish' [sic]. I don't know what's going on.

███████    Aight. Do what you are doing, man.

███████    But I am not… I am not going to bother using back that, them people there again. I am done. I am done off with them completely.

███████    Aight.

███████    Yeah. So, when I see you, but…

███████    … do what you are doing and let me know.

███████    So, it probably… it's not going to be until, like, maybe, like, Saturday.

███████    Aight. Aight, do your thing.

███████    Yeah. Mmhmm.

███████    Aight.

145.    Based on my training, experience, and knowledge of the investigation, and based on the above referenced call, in conjunction with the seizure of cocaine on April 22, 2024, your affiant believes ███████ is informing ███████ that a package of cocaine, destined for ███████ has been delayed. Your affiant is aware, based on previous seizures of cocaine from ███████ as referenced within this affidavit, that ███████ has become increasingly frustrated using FedEx to ship quantities of narcotics from California to Rochester, New York. Your affiant also believes that that the approximately eight (8) kilograms of cocaine seized by investigative team members on April 22, 2024, was

ultimately destined for ███████ for the purpose of wide-scale distribution in the Rochester, New York area.

146.    On May 1, 2024, the Honorable Elizabeth A. Wolford, Chief United States District Judge for the Western District of New York, issued an Order re-authorizing the interception of wire communications, and authorizing the initial interception of electronic communications, over **Target Telephone 1**, a facility utilized by ████████████ On May 1, 2024, the Hon. Elizabeth A. Wolford also issued an Order authorizing the initial interception of wire and electronic communications over **Target Telephone 2**, a facility utilized by **TORREN MILLER**.

147.    On May 13, 2024, at approximately 10:10 p.m., investigative team members lawfully intercepted a call from ████████████ utilizing **Target Telephone 1**, to ████████ ████████ utilizing **AM-4**. In relevant part, ████████ and ████████ communicate the following:

████████        Yo?

████████        How you came back and didn't shout me, pa?

████████        I just got here, man. I just got in today.

████████        You lying.

████████        Uh uh. I arrived today. What's happening?

████████        I heard you came back since Saturday.

████████        How could it be Saturday, and Saturday was the event? No, [UI] Biggs...

████████        Huh?

████████        Biggs... Biggs couldn't tell you that. You are lying.

94



████████  That's what I heard. That's what Biggs said... you came back since Saturday.

████████  Biggs wasn't here on Saturday, so he couldn't tell you that.

████████  Biggs went to Jamaica?

████████  Yes, he is down there. Yes.

████████  Yeah, but he told me that [telephone ringing] but he told me that you came back since Saturday.

████████  But, I didn't come back Saturday.

████████  Oh. So, if anything – yeah, but I'm getting myself ready for you [UI] this weekend. Yeah?

████████  Yeah, this weekend?

████████  Yeah.

████████  Alright, say less.

████████  'Cause I had missed the ride, so I am waiting on the next movement.

████████  Aight, okay.

148.  Based on my training, experience, and knowledge of the investigation, and based on the above-referenced conversation, your affiant believes ████████ and ████████ are discussing how ██████ is getting ready to resupply ████████ with a quantity of cocaine in the near future.  Your affiant also believes that when ██████ says he "had missed the ride" and was "waiting on the next movement", ██████ is referring to missing the last shipment of narcotics being transported by tractor trailer.  This investigation has revealed that ██████ and DTO members have begun to utilize tractor trailers instead of parcel services to ship larger quantities of cocaine from California to New York.

149.    On May 16, 2024, at approximately 10:03 a.m., investigative team members lawfully intercepted a call from ████████████ utilizing **NM-2**, to ████████████ utilizing **Target Telephone 1**. In relevant part, ████████ and ████████ communicate the following:



████████    So, what's going on?

████████    I'm here, man. Um, I'm going to be good in – by this weekend.

████████    Okay, okay, oaky.

████████    Mmhmm. Because I don't um, about – what are you going to – about how much are you going to blah?

████████    I don't know. [Stammers] You said – what, whatever you said you were going to do. What did you say?

████████    What did I say?

████████    You said you were going to- load up! Fuck!

████████    [Laughs]

████████    Isn't that what you had said? Isn't that what you had said? You – I said, "Yo, I'm going to blah-blah-blah?"

████████    That's what I had said.

████████    I mean [UI] whatever I got, I just deal with… you know?

████████    That's what I had said. I'm going to load up! So, make sure you're ready.

████████    Of course, man.

████████    Because it doesn't look as if you can manage the things.

████████    Huh?

████████    It doesn't look as if you can manage the thing, you know?

████████    Yeah. [chuckles] Yeah.

████    From the other day, you've gotten soft, man. Hold on. Don't hang up my brother. Don't hang up. Don't hang up.

████    Mmhmm.

████    Your boy is calling me, um…

**[SIDE CONVERSATION/ONE SIDED]**

████    Yeah, Biggs? Yeah. Uh huh. Yeah, yeah. Yeah, man. 'Cause, man, I don't know… from the other day, you got soft. Huh? The guys said…the guys said Mr. Biggs is ineffective. Mr. Biggs is not shining like a diamond anymore. [laughs] Yeah, yeah. Today is Thursday. Mmhmm, I'm talking to my daughter. I'm dropping her off at school. Yeah, man. We are going to… we're going to go straight up, man. We'll come in [UI] paper. Paper should just be thrown at the dawgs, man. 'Cause the dawgs are going to let me – they're going to open up the pipeline, you know.

**[LATER IN CONVERSATION]**

████    Check this out. I have a – see these people now?

████    Uh huh.

████    Huh? I'm trying to… these people love fast movements! So, that's what I'm trying to work with them on. Some fa – 'cause I got some nice licks over here for them, you know. You understand me?

████    Uh huh.

████    Even the other day, the guy smiled. The guy smiled and said to me, "Yo, man, I like how you doing." That's the big man.

████    Mmhmm.

████    'Cause I went boom! You know, and, and, um, and made a… and made a forty - what did I lick? Forty-four, you know, all at once, you know. Right?

████    Mmhmm.

████    And then I went boom! And hit a twenty. Then I went boom! And hit a thirty-five. The man said, "What!" Once time, you know. I gave the guy, I gave the guy over an M, you know?

███████    Yeah.

███████    The man felt nice! You know what I'm saying?

150.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced conversation, your affiant believes that ███████ is telling ███████ about his new source of supply for cocaine. When ███████ says, "And then I went boom! And hit a twenty. Then I went boom! And hit a thirty-five. The man said, "What!" Once time, you know. I gave the guy, I gave the guy over an M, you know?", your affiant believes ███████ is referring to selling approximately fifty-five (55) kilograms of cocaine for this new source of supply. Your affiant also believes that when ███████ says he "gave the guy over an M", ███████ is stating that he gave his source of supply approximately $1,000,000 is illicit proceeds. Your affiant aware that drug traffickers will typically use coded words to disguise their drug trafficking activities. In this case, your affiant believes that "an M" refers to a million dollars.

151.    On May 16, 2024, at approximately 10:06 a.m., investigative team members lawfully intercepted a call from ███████████████ utilizing **AM-3**, to ██████████ ███████ utilizing **Target Telephone 1**. In relevant part, ███████ and ███████ communicate the following:

███████    [UI] called me already, so much [UI].

███████    Why do you... why do you sound so far away? What did you say?

███████    I said that the man already called me four times, you know. When I came...

███████    Oh. Yeah, man. I'm good for, for – it's the ride – it's because Mother's Day came and the men didn't leave. So, I'm waiting on the ride. I'm not doing it without the ride.

▓▓▓▓▓▓    Alright. Do what you're doing, man. Yeah.

▓▓▓▓▓▓    But you're good, man. Um, what you call it…

▓▓▓▓▓▓    Yeah.

▓▓▓▓▓▓    … are you hearing me?

▓▓▓▓▓▓    Uh huh.

▓▓▓▓▓▓    I have a – do you want me to send… do you want me to send you a, a, a line?

▓▓▓▓▓▓    Yeah, just send it when you're coming – when they're coming.

▓▓▓▓▓▓    Alright. No, I won't be able to send it now. I'll send it to you at another time because I'll have to buy it from the guy. It's one of those good, good things. Alright, cool.

▓▓▓▓▓▓    Alright.

▓▓▓▓▓▓    Mmhmm.

152.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes �naturaleza is telling ▓▓▓▓ that the next shipment has not been sent yet. This investigation has revealed that ▓▓▓▓ is now utilizing tractor trailers to ship his cocaine across the United States. When ▓▓▓▓ says "Mother's Day came and the men didn't leave", your affiant believes ▓▓▓▓ was referring to the truck drivers not making any trips due to the holiday. You affiant also believes, based on ▓▓▓▓ telling ▓▓▓▓ that he will send him "a line" and that he has to "buy it from the guy", ▓▓▓▓ is referring to sending ▓▓▓▓ an alternate phone number to use that will have encryption capabilities. Your affiant is aware that drug traffickers will typically utilize multiple cellular devices to evade detection by law enforcement.

153.    On May 16, 2024, at approximately 10:17 a.m., investigative team members lawfully intercepted a call from ███████████ utilizing **AM-3**, to ███████ ███████ utilizing **Target Telephone 1**. In relevant part, ███████ and ███████ communicate the following:

███████    Mmhmm. So, what... what are we looking at?

███████    Two – probably 2-0, man.

███████    Oh, oh.

███████    [Background noise]

███████    Mmhmm. Oh, put it together.

███████    [UI]

███████    It's, it's the holiday kind of made – kind of messed me up st – messed me up.

███████    So, I don't have to move until when? [UI] link then?

███████    No, man! No! No! No! Hell no!

███████    Alright, I'm leaving town tomo – in the morning, then.

███████    Tomorrow is what? Friday?

███████    Yes, tomorrow is Friday.

███████    Alright, you can probably leave out about Saturday.

███████    I'll leave in the morning, man, and take my time.

███████    Okay.

154.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced conversation, your affiant believes that when ███████ says "2-0", ███████ is ordering twenty (20) kilograms of cocaine from ███████ Your affiant

is aware that drug traffickers will typically use coded or short-handed words when discussing their drug trafficking activities.

155.    On May 22, 2024, at approximately 6:37 p.m., investigative team members lawfully intercepted a call from ▮▮▮▮▮▮▮▮▮ utilizing **AM-4**, to ▮▮▮▮▮▮ ▮▮▮▮ utilizing **Target Telephone 1**.    In relevant part, ▮▮▮▮▮ and ▮▮▮▮ communicate the following:

▮▮▮▮        Hello?

▮▮▮▮▮        [UI] a new food truck or something long?

▮▮▮▮        No, man. Give me – I'll soon call you back. It's what I'm here working on. Don't worry.

▮▮▮▮        Alright, say nothing. Just – Just - Just let me know so that I can make my move so I don't have to…

▮▮▮        Yeah.

▮▮▮▮▮        … to keep calling you. Alright my brother.

▮▮▮▮        Alright. Mmhmm.

156.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced conversation, your affiant believes that ▮▮▮▮ and ▮▮▮▮▮ are discussing the logistics of an incoming shipment of cocaine from ▮▮▮▮ to ▮▮▮▮▮    As referenced within this affidavit, due to the approximately thirty-three (33) kilograms of cocaine seized by investigative team members from the DTO, mostly from UPS and FedEx services, ▮▮▮▮ has begun transporting his cocaine utilizing a tractor trailer, which ▮▮▮▮ has previously referred to as the "machine", rather than a parcel service.    Your affiant believes ▮▮▮▮ is utilizing this method to evade detection by law

101

enforcement. Your affiant is aware that drug traffickers will commonly switch distribution and trafficking tactics when they believe they are being investigated by law enforcement.

157. On May 23, 2024, at approximately 12:10 p.m., investigative team members lawfully intercepted a call from ████████████ utilizing **AM-4**, to ████████ ██████ utilizing **Target Telephone 1**. In relevant part, ████████ and ████████ communicate the following:

████████ Hello?

████████ What, what do you want me to tell the brothers? Next, next week?

████████ Yeah, man. Te – um, 'cause that guy – I spoke to him this morning. He's saying that, like, they'll be leaving out closer to the weekend. So, probably it will be this weekend.

████████ Alright. Alright, I'll let them know.

████████ Or, or Sunday. One of those days. Do you know what I mean? 'Cause…

████████ Mm.

████████ … they have a little delay, so… I didn't bother to rush anything.

████████ Alright, I'm going to… I'm going to see him in person [UI].

████████ Huh?

████████ I said I'm going to pull up on him and talk to him.

████████ Yeah, man. Talk to him and tell him. But, tell him that it'll be soon – the thing will soon… soon be good.

████████ Alright, say less.

████████ Yeah.

158. Approximately twelve (12) minutes later, investigative team members

lawfully intercepted a text message from ██████████ utilizing **Target Telephone 1**, to ██████████ utilizing **NM-2**. In relevant part, ██████ texts ██████ the following:

██████        Up

159.    Based on my training, experience, and knowledge of the investigation, and based on the above referenced call, combined with the above-referenced text message, your affiant believes that ██████ is telling both ██████ and ██████ that he is being resupplied with a quantity of cocaine and that he will be sending a shipment of said cocaine to ██████ and ██████ that coming weekend. This investigation has established a pattern showing that when ██████ is resupplied with cocaine, he will either call DTO members here in Rochester to inform them of such, or ██████ will text DTO members with the word "Up", which your affiant believes is another way that ██████ communicates with DTO members.

160.    On May 30, 2024, the Honorable Elizabeth A. Wolford, Chief United States District Judge for the Western District of New York, issued an Order re-authorizing the interception of wire and electronic communications over **Target Telephone 1**, a facility utilized by ██████████.

161.    On June 4, 2024, at approximately 12:39 p.m., investigative team members lawfully intercepted an outgoing call from ██████████ utilizing **Target Telephone 1**, to ██████████ utilizing **NM-2**. In relevant part, ██████ and ██████ communicate the following:

██████        Why do you... why do you treat your boy so, so badly, man?

103

Yo, you're a funny – yo… [chuckles] Fuck.

Why do you treat your boy so badly, man?

Huh?

Why do you treat your boy so badly?

What, what it is? What happened? I didn't answer – you told me last – you told – two weeks ago you told me Friday.

Man, brother, the transportation was causing me issues, but I've found one. Yeah?

You were having issues with it?

Yeah. I couldn't get a transportation. Those guys… and then those guys left me. I think those guys are envious of me because I got that connect. You see what I'm saying?

Right, right, right, right.

Yeah, but I think they left me, and… just a lot of bullshit, dawg. See what I'm saying? So, I finally got my own little transport.

Oh yeah?

Yeah. So, we are going to be good now. Right?

Right. Yeah, man.

And, um [stammers] but I have a little issue that I want – I have a little issue. That's why I'm calling you to [UI] – to tell you. I have a little issue, right?

Uh huh.

The guy was supposed to, um – 'cause they were supposed to do it for me a few days ago, and it was supposed to go to the city! But then because they are… they're playing games – I'm playing – they're playing games with me, I ended up… I ended up moving. Yeah?

Wait, wait, wait. What did you say just now?

104

██████  Because they are playing games with me?

██████  Yeah.

██████  The riders. So, I ended up… I ended up not [stammers] making it. So, I ended up having to take the paperwork back from them 'cause it was in the city, right?

██████  Right.

██████  So, I have a rider who's coming close to you.

██████  Uh huh.

██████  But I'm supposed to give him twenty-five (25). But my, my, my, um, baby's mother has eleven (11), so I want fourteen (14) to give to him, so I can get – to get the things from him. 'Cause it's twenty-fi – he charged me twenty-five (25)… to bring it.

██████  Uh huh.

██████  So, she's going to be in your town… Thursday? And if you can just give her fourteen (14), and, and then… and then just stay close 'cause she's going to bring the thing back… bring the thing back to you.

██████  Alright.

██████  So, listen out for my call. How many are you going to need?

██████  Well, [UI] ten (10). Twenty (20).

██████  Okay. Alright, I don't – it's not a whole lot. I – 'cause I had to – because of those guys, I ended up having to get rid of some of them over here because I had those guys' thing for such a long time.

██████  Yeah.

██████  But I should be able to do the ten (10) though. And, um… and then I'd just have to… hurry up and come back, and, and try to get some more from him and build my thing back up with them 'cause those guys fucked me over, man. Those guys made it seem like I'm not able to move the thing. See what I'm saying?

██████  Right.

105

███████    Because I can't – because I couldn't get the ride, and I don't want [UI] – fuck with this mailing thing, man. [UI] fucked me up too much. I can't – he – they put me in a hole.

███████    Right, right, right.

███████    Alright?

███████    Alright. Alright.

███████    Mmhmm. So, everything is good.

███████    Yeah.

███████    Alright. So, we will link up. So, I'll call you back. So, Thursday I'm going to… so, Thursday morning – listen out for me Thursday morning, so they'll be able to get the paper to pay them… put together to pay them.

███████    Alright. Yeah.

███████    Okay. Mmhmm.

162.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, your affiant believes that ██████████ is telling ██████████ that he is sending his ex-wife, **BRENDA ROPER**, to pick up $14,000 in from ████████ to pay the delivery fee for an incoming shipment of cocaine. This investigation has revealed that **BRENDA ROPER** will collect illicit proceeds from DTO members in Rochester, New York, and send said proceeds back to ██████████ in Calabasas, California.

163.    On June 6, 2024, at approximately 6:32 p.m., investigative team members lawfully intercepted a call from ██████████ utilizing **NM-2**, to ██████████ utilizing **Target Telephone 1**. In relevant part, ██████ and ██████ communicate the following:

███████        Yeah?

███████        Hello?

███████        … that's my blood pressure is high!

███████        Hello?

███████        Yo.

███████        What's going on?

███████        Mm, I'm here.

███████        I want to do my – Alright so, the machine has – will be pulling up late
               tonight, but I'll be ready for you tomorrow morning. Do you hear me?

███████        Alright.

███████        But I want you to give homegirl the paperwork so that she can pay him in the
               morning. So, she won't have to come to you first, and then go to him, and
               then come back. So, she'll just make one trip. Go straight and then just come
back. Right?

███████        Mmhmm.

███████        Is that cool?

███████        Yeah, but when is she coming? Yeah, yeah, I [UI]…

███████        She's, she's, she's taking… she's taking her son to the doctor today, so I'll find
               out from her, like, what time she's going… she's going to come out there…

███████        Alright.

███████        … leave out the hospital. Right? Alright? And juts listen… are you hearing
               me?

███████        Yeah.

███████        Just get up as much paperwork as you can put together 'cause I'm, I'm
               trying–

███████        Yeah [UI].

███████  The, the driver is coming back over, and I want him to just bring over the paperwork for that is going to be... better for me. And then I have some more that will be coming over. So, let's start the work now. Everything is going to start now. Now you'll have to be running around.

███████  Alright.

███████  Alright? So...

███████  Yeah.

███████  ... put as much together as possible.

164.  At the time of the call above, investigative team members, conducting physical surveillance of ███████ at 2600 Monroe Ave. in Rochester, New York, observed ███████ arrive in a gray-colored 2013 Honda Accord and park next to a red-colored Dodge Caravan, bearing New York license plate number KWF2979 and registered to **BRENDA ROPER** at 367 Dutch Hill Rd. in Frankfort, New York. **BRENDA ROPER** was then observed approaching the driver's-side window ███████ vehicle where ███████ handed **BRENDA ROPER** a green-colored bag. **BRENDA ROPER** was then observed returning to the Dodge Caravan before leaving the area.

165.  Based on my training, experience, and knowledge of the investigation, and based on the above-referenced calls on June 4, 2024, and June 6, 2024, combined with the above-referenced surveillance, your affiant believes that the green-colored bag that ███████ handed to **BRENDA ROPER** contained the $14,000 that ███████ had requested ███████ give to **BRENDA ROPER** to pay the driver of the incoming cocaine shipment, as referenced in the June 4, 2024 call.

166.  On June 10, 2024, at approximately 1:28 p.m., investigative team members,

108

conducting electronic surveillance, observed **ROXROY ROPER**'s white-colored Honda SUV arrive at park behind E&G Mailboxes and Watch Repair, located at 357 S. Fairfax Ave. in Los Angeles, California. **ROXROY ROPER** was then observed exiting the front, driver's-side door and walking inside E&G Mailboxes and Watch Repair through the rear entrance. Approximately two (2) minutes later, **ROXROY ROPER** was observed exiting the rear entrance, opening the rear hatch of the Honda SUV, retrieving a large, brown-colored box from the trunk, and taking the box back into E&G Mailboxes and Watch Repair. Approximately thirteen (13) minutes after that, at 1:43 p.m., **ROXROY ROPER** was observed exiting the rear entrance to the business once again, entering the Honda SUV's front, driver's-side seat, and leaving the area.

167. Based on my training, experience, and knowledge of the investigation, and based on the above-referenced surveillance, your affiant believes **ROXROY ROPER** was delivering a quantity of ██████████ cocaine to E&G Mailboxes and Watch Repair for shipment to DTO members in Rochester and Utica, New York. Your affiant believes that the package **ROXROY ROPER** delivered to E&G Mailboxes and Watch Repair contained cocaine because the package matched the size, color, and description of previously seized packages of cocaine sent by ██████████ and **ROXROY ROPER** from E&G Mailboxes and Watch Repair to DTO members in Rochester and Utica, New York. United States

168. On June 17, 2024, at approximately 10:14 a.m., investigative team members, monitoring electronic surveillance, observed ██████████ arrive at 312 6th St in Rochester, New York. Approximately twenty-six (26) minutes later, at 10:50 a.m.,

investigative team members then observed **STEPHEN MILLER** arrive and park in the driveway of 152/154 Genesee Park Blvd. **MILLER** exited his vehicle and entered 154 Genesee Park Blvd. through the front door, using a key. Approximately nine (9) minutes later, investigative team members lawfully intercepted a call from ███████████ utilizing **Target Telephone 1**, to ████████████ utilizing **AM-4**. In this conversation, ██████ tells ██████ "The dawg is coming to see you shortly when his thing is... tell me. I'm going to call you back and you tell me where he's supposed to come," to which ██████ replies, "Oh, it's, it's my youth them of the [UI]." ██████ then says, "It's just... the white youth, man. The white boy," to which ██████ replies, "Alright. Tell him that I am at home, man. He knows where." Later in the conversation, ████████ reiterates, "Over six (6)."

169. At approximately 11:01 a.m., investigative team members observed **STEPHEN MILLER** arrive at 633 Post Ave. and park in front of the premises. At that time, an unknown female was observed walking from the front porch of 633 Post Ave. toward **MILLER** and handing **MILLER** a small bag.

170. At approximately 11:18 a.m., investigative team members, monitoring electronic surveillance, observed **MICHAEL DIMARTINO** leave 43 Mercer Ave. and drive directly to the UPS store, located at 144 Fairport Village Landing in Fairport, New York. **DIMARTINO** was then observed walking into the UPS store. After approximately ten (10) minutes, at 11:28 a.m., investigative team members lawfully intercepted a call from ████████████ utilizing **Target Telephone 1**, to ████████████ utilizing **AM-4.** In this conversation, ██████ tells ███████ "See if you can get Biggs for me now because

110

I did borrow some money from him and I want him to what-you-call-it. See if you can get him for me," to which ███████ replies, "Aight, aight."

171.    At approximately 11:46 a.m., investigative team members, conducting physical surveillance, observed DIMARTINO exit the UPS store carrying a large, brown-colored box. DIMARTINO proceeded to place the box in the trunk of his vehicle before leaving the area. Approximately two (2) minutes later, investigative team members lawfully intercepted another call from ████████████ utilizing **Target Telephone 1**, to ████████████ utilizing **AM-4**. In this conversation, ████████ asks █████ "Yeah, how much to give him?", to which █████ replies, "Um, give him four (4) bills." ████████ follows up that statement by saying, "Yeah, um… don't throw away the track."

172.    At approximately 12:09 p.m., **DIMARTINO** was observed pulling into the driveway of 312 6th St., where he remained for approximately two (2) minutes before leaving. **DIMARTINO** was then observed driving to the Walmart, located at 3800 Dewey Ave. in Greece, New York, the location of another UPS store.

173.    At approximately 12:39 p.m., ████████ was observed leaving 312 6th St. while, minutes later, **STEPHEN MILLER** was observed parking in the driveway of 152/154 Genesee Park Blvd. **MILLER** was then observed exiting his vehicle and entering 152 Genesee Park Blvd. through the front door. Approximately seventeen (17) minutes after that, at 12:56 p.m., █████████ was observed arriving at 633 Post Ave. in a 2016 Ford Edge and parking in the driveway behind **MILLER's** vehicle. ████████ was then observed carrying a blue-colored shopping bag into 633 Post Ave., followed by **MILLER**, carrying a red-colored shopping bag.

111

174. At approximately 1:02 p.m., Amanda Stroller was observed exiting the Walmart/UPS store at 3800 Dewey Ave. with a large, brown-colored box, similar in size and shape to the box **DIMARTINO** retrieved at the UPS store in Fairport, New York, earlier that day. The above-referenced box was placed in the trunk of **DIMARTINO's** vehicle before **DIMARTINO** left the area. Approximately two (2) minutes later, at 1:04 p.m., investigative team members lawfully intercepted a call from ▮▮▮▮▮▮▮▮ utilizing **Target Telephone 1**, to ▮▮▮▮▮▮▮ utilizing **NM-2**. In this conversation, ▮▮▮▮ asks ▮▮▮▮ "Yeah, where are you? He's ready," to which ▮▮▮▮ replies, "Right now, I'm in Greece. I'm in Greece coming in the city now." ▮▮▮▮ then asks, "So, where do you want him to go?", to which ▮▮▮▮ replies, "To that Family Dollar... go to the Family Dollar." Approximately four (4) minutes later, at 1:08 p.m., **DIMARTINO** was observed arriving at the Family Dollar, located at 550 Stone Rd. in Greece, New York. **DIMARTINO** parked on the south-facing side of the parking lot, retrieved the large, brown-colored box from the trunk of his vehicle, and carried the box over to ▮▮▮▮▮▮▮ who took possession of the box.

175. At approximately the same time as the **DIMARTINO/**▮▮▮▮▮ meeting, investigative team members observed **STEPHEN MILLER** and ▮▮▮▮▮▮▮▮▮ exit 633 Post Ave., enter ▮▮▮▮▮ vehicle, and leave the area. Investigative team members immediately established physical surveillance at 81 Andy Lane and observed ▮▮▮▮▮▮ vehicle parked in the driveway at approximately 1:31 p.m. Approximately nineteen (19) minutes later, at 1:50 p.m., ▮▮▮▮▮ was observed pulling up in front of 633 Post Ave. and dropping **MILLER** off.

112

176.    At approximately 2:00 p.m., investigative team members, conducting electronic surveillance, observed **BRENDA ROPER** leaving her residence of 367 Dutch Hill Rd. in Frankfort, New York, in a red-colored Dodge Caravan, bearing New York license plate number KWF2979 and registered to **BRENDA ROPER** at 367 Dutch Hill Rd.

177.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced calls, combined with the above-referenced surveillance of the DTO members, your affiant believes the following: 1) ███████████ picked up **STEPHEN MILLER** at 633 Post Ave. and took **MILLER** to 81 Andy Lane to collect money for the incoming shipment of cocaine from ██████████ 2) **MICHAEL DIMARTINO** received two (2) separate packages containing cocaine at two (2) separate UPS stores in the Rochester, New York area; 3) **DIMARTINO** then delivered one (1) of those packages to ████████████ at 312 6th St.; 4) **DIMARTINO** then delivered a second package of cocaine to ██████████ at the Family Dollar in Greece, New York who, in turn, transported said package to 138 Yates St.; 5) and **BRENDA ROPER** drove from 367 Dutch Hill Rd. in Frankfort, New York, to Rochester, New York, to receive approximately $57,600 in illicit proceeds from DTO members exchange for the two (2) packages of cocaine.

178.    On June 21, 2024, at 4:36 p.m., investigative team members, conducting electronic surveillance, observed **ROXROY ROPER's** 2022 Honda HR-V EX-L SUV exit the Park South Street community and head toward downtown Los Angeles, California. Approximately fifty-two minutes later, at 5:30 p.m., electronic surveillance then observed the **ROXROY ROPER's** vehicle arrive and park behind E&G Mailboxes and Watch

Repair, located at 357 South Fairfax Avenue in Los Angeles, California. �In L was observed exiting the vehicle and entering E&G Mailboxes and Watch Repair while **ROXROY ROPER** retrieved two (2) bags from the rear of the vehicle and walked the bags into the premises through the rear entrance.

179. Approximately ten (10) minutes later, at 5:40 p.m., investigative team members intercepted a call from ▇▇▇▇▇▇▇ utilizing **Target Telephone 1**, to ▇▇▇▇▇▇▇ utilizing **AM-4**. In this conversation, ▇▇▇ tells ▇▇▇ "I called him. He's not ready yet, man. He said he's not, um – he's moving. He has a U-Haul truck over there," to which ▇▇▇ replies, "Can't be paying for people to go back and forth, brother. I do not have the money to be doing that." ▇▇▇ then says, "Listen, I can pay for one (1) and then I'll drive the other one (1) – well, probably tomorrow." A review of historical electronic surveillance showed a U-Haul truck parked at 633 Post Ave. in Rochester, New York, a location this investigation has identified to be a narcotics stash house for **STEPHEN MILLER**, during the time of the call above.

180. Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call and surveillance, your affiant believes ▇▇▇▇ and **ROXROY ROPER** transported a quantity of cocaine to E&G Mailboxes and Watch Repair. When ▇▇▇ tells ▇▇▇ that he can "pay for one" and then "drive the other one", your affiant believes ▇▇▇ and ▇▇▇ were discussing ▇▇▇ only being able to pay for one (1) kilogram of cocaine at that time. Your affiant believes that, although investigative team members observed a U-Haul truck at 633 Post Ave. on this date, **STEPHEN MILLER** continues to use 633 Post Ave. as a location to store and package

114

narcotics for street-level sales. Investigative team members have continued to observe
**MILLER** and ███████████ visiting this location in the days and weeks after the U-Haul truck was seen parked in the premises' driveway. Your affiant is aware that narcotics dealers will typically change the their drug trafficking locations every few months to evade detection by law enforcement. Your affiant is also aware that drug traffickers and dealers will still maintain a connection to these locations because they feel a certain level of safety and familiarity with such locations.

181.   On June 22, 2024, at approximately 8:36 a.m., investigative team members lawfully intercepted a call from ███████████ utilizing **Target Telephone 1**, to ████ ███████████ utilizing **NM-2**. In this conversation, ████████ says, "Um… supposed to get something today, you know. Do you want it?", to which ████████ replies, "Yeah, like wha – like what?" ████████ then says, "I think it's four. I think it's four," to which ████████ replies, "Alright."

182.   Later that morning, at approximately 11:22 a.m., investigative team members, conducting electronic surveillance, observed ███████████ pull up and park in front of 115 Oriole St. before **STEPHEN MILLER** was observed exiting the front door of 115 Oriole St. and entering the ████████ vehicle. Approximately thirty-two (32) minutes later, at 11:54 a.m., electronic surveillance of the **MICHAEL DIMARTINO** showed **DIMARTINO** parked at 2430 Military Rd. in Niagara Falls, New York, the location of a UPS store. Approximately twelve (12) minutes after that, at 12:06 p.m., investigative team members lawfully intercepted a call from ███████████ utilizing **Target Telephone 1**, to ███████████ utilizing **AM-4**. In this conversation,

115



asks ███████ "So, just – you did the one? You finished the one already?", to which ███████ replies, "Not yet. In a minute though." ███████ then tells ███████ "Yeah, 'cause I'm going to have homegirl come to that side in the next – probably about three hours or so."

183.    At approximately 12:12 p.m., investigative team members lawfully intercepted a call from ███████ utilizing **NM-2**, to ███████ utilizing **Target Telephone 1**. In this conversation, ███████ asks ███████ "So, tell her five o'clock?", to which ███████ replies, "Yeah." Later in the conversation, ███████ tells ███████ " What I'm doing is – guess what… guess what – instead of… instead of doing… instead of doing four each, like before? I just do two. And do a bunch of them. So, that's how I'm doing it now to try to catch back up with this thing." At approximately 12:40 p.m., electronic surveillance of ███████ revealed ███████ leave 312 6th St., drive directly to 136 Wahl Rd., where it remained for approximately three (3) minutes before driving directly to 972 Avenue D., all locations this investigation has revealed to be utilized by ███████ for drug trafficking purposes.

184.    At approximately 2:20 p.m., investigative team members lawfully intercepted a call from ███████ utilizing **Target Telephone 1**, to ███████ utilizing **NM-2**. In this conversation, ███████ has a second phone connected with **MICHAEL DIMARTINO** in the background. In this conversation, ███████ tells ███████ "Give him five hundred dollars for me." Moments later in the conversation, **DIMARTINO** tells ███████ "I'm on Ridgeway… I'm on Ridgeway going towards Dewey," to which ███████ replies, "Go to the Taco Bell on Lake Ave. then!" Approximately three (3)

minutes after that, electronic surveillance revealed **DIMARTINO** leaving 43 Mercer Ave. and drive directly to the Taco Bell, located at 358 Lake Ave. in Rochester, New York.

185.    At approximately 2:48 p.m., investigative team members lawfully intercepted another call between ████████████ utilizing **Target Telephone 1**, and ██████ ██████ utilizing **NM-2**. In this conversation, ██████ tells ██████ "So, she's... getting there around three thirty - four. You hear?", to which ██████ replies, "Alright. Alright." Approximately fifteen (15) minutes later, at approximately 3:04 p.m., ████████ utilizing **NM-2**, was lawfully intercepted contacting ████████ utilizing **Target Telephone 1**. In this conversation, ████████ tells ██████ "Yo, I forgot to take out the one," to which ██████ replies, "Which one? Oh, the thousand dollars?" ██████ then says, "she is getting there at three-thirty – four."

186.    At approximately 3:47 p.m., **BRENDA ROPER's** red-colored Audi sedan was observed heading westbound on I-90 toward Rochester, New York. At approximately 3:51 p.m., investigative team members lawfully intercepted a call from ████████████ utilizing **Target Telephone 1**, to ████████████ utilizing **AM-4**. In this conversation, ████████ tells ██████ "Wegmans on East Ridge Rd." Approximately nine (9) minutes later, electronic surveillance of ██████ showed ██████ leaving 136 Wahl Rd. and drive directly to the Wegmans, located at 220 E. Ridge Rd. in Rochester, New York. Approximately thirty (30) minutes after that, ████████ was lawfully intercepted calling ████████████ In this conversation, ████████████ has **BRENDA ROPER** on another call in the background. ████████████ asks **BRENDA ROPER**, "Are you in a brown minivan?", to which **BRENDA ROPER** replies, "No? I'm in an Audi.

117

I told you in on the back wall."

187.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced series of calls, combined with the above-referenced surveillance, your affiant believes **MICHAEL DIMARTINO** drove to a UPS store in Niagara Falls, New York, to receive a package of cocaine shipped by ▮▮▮▮▮▮▮▮ Your affiant then believes that **DIMARTINO** drove the cocaine back to his residence of 43 Mercer Ave. before ultimately delivering it to ▮▮▮▮▮▮ at the Taco Bell, located at 358 Lake Ave.  Your affiant further believes that ▮▮▮▮▮▮ then directed both ▮▮▮▮▮▮ and ▮▮▮▮▮▮ to deliver the illicit proceeds of previous narcotics sales to **BRENDA ROPER** at the Wegmans, located at 220 E. Ridge Rd.

188.    On June 24, 2024, at approximately 2:24 p.m., investigative team members, conducting electronic surveillance, observed the **ROXROY ROPER's** 2022 Honda HR-V EX-L SUV exit the Park South Street community and head toward downtown Los Angeles, California.  Approximately forty-four (44) minutes later, at 3:08 p.m., electronic surveillance then observed **ROXROY ROPER's** vehicle arrive and park behind E&G Mailboxes and Watch Repair, located at 357 South Fairfax Avenue in Los Angeles, California.  ▮▮▮▮▮▮ was observed exiting the vehicle and entering E&G Mailboxes and Watch Repair while **ROXROY ROPER** retrieved two (2) bags from the rear of the vehicle and walked the bags into the premises through the rear entrance.

189.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced surveillance, your affiant believes that ▮▮▮▮▮▮ and **ROXROY ROPER** transported a quantity of cocaine to E&G Mailboxes and Watch

118

Repair. As referenced within this Affidavit, investigative team members have observed ████████████ and **ROXROY ROPER** drive to E&G Mailboxes and Watch Repair on numerous occasions. The packages being transported by ████████████ and **ROXROY ROPER** typically match the size, shape, and characteristics of packages previously seized by investigative team members that contained cocaine.

190. On June 25, 2024, at approximately 12:27 p.m., investigative team members lawfully intercepted a call from ████████████ utilizing **Target Telephone 1**, to ████████████ utilizing **AM-4**. In this call, ██████ says, "So, he is going to pick the last thing, and then he is going to link you. Where are you going to want him to link you?", to which ██████ replies, "Tell him to come to Fifty-Eight Chandler, Chandler St." Around the same time as this call was placed, electronic surveillance of **MICHAEL DIMARTINO** showed **DIMARTINO** leave 43 Mercer Ave. and travel to 2604 Elmwood Avenue in Rochester, New York, the location of a UPS store. Approximately twenty (20) minutes later, **DIMARTINO** was observed travelling back to 43 Mercer Ave. before ultimately parking at that location at 1:04 p.m. Electronic surveillance of ██████ at the time of the above-referenced call revealed ██████ to be parked at 633 Post Ave. Approximately four minutes after that, at 1:08 p.m., electronic surveillance revealed the **DIMARTINO** leave 43 Mercer Ave. and drive directly to the area of 58 Chandler St. Electronic surveillance of ██████ also showed ██████ to be located in the same area, 58 Chandler St., as **DIMARTINO**.

191. At approximately 1:31 p.m., electronic surveillance showed ██████ arrive and park in the driveway of 152/154 Genesee Park Blvd. in front of **STEPHEN MILLER's**

119

2024 GMC Yukon. ▮▮▮▮▮▮ was observed exiting his vehicle and walking into 152 Genesee Park Blvd., where ▮▮▮▮▮▮ remained for approximately four (4) minutes before exiting the residence, retrieving a large, white-colored box from the interior of his vehicle, and taking the box around the rear-side of 152/154 Genesee Park Blvd. Approximately one (1) hour later, at 2:30 p.m., investigative team members lawfully intercepted a call from ▮▮▮▮▮▮▮▮ utilizing **Target Telephone 1**, to ▮▮▮▮▮▮▮▮ utilizing **AM-4**. In this conversation, ▮▮▮▮▮ tells ▮▮▮▮▮ "She says she's going to be there about… four o'clock."

192.   Later that day, at approximately 5:05 p.m., investigative team members lawfully intercepted another call from ▮▮▮▮▮▮ to ▮▮▮▮▮▮ In this conversation, ▮▮▮▮▮ tells ▮▮▮▮▮ "So, just bring the one and give it to homegirl. Let her – because my friend down the road is going to take it," to which ▮▮▮▮▮ replies, Alright, say less. Alright." Approximately ten (10) minutes later, ▮▮▮▮▮ calls ▮▮▮▮▮ again, this time with **BRENDA ROPER** in the background on another phone ▮▮▮▮▮ ▮▮▮▮▮ is utilizing. In this conversation, ▮▮▮▮▮▮▮ asks **BRENDA ROPER**, "So, you at Wegmans?, to which **BRENDA ROPER** replies, "Yeah. I'm at Wegmans. That's where I'm at." ▮▮▮▮▮ then says, "I know where she is, man. I know where she is." Approximately two (2) minutes after this call, electronic surveillance observed ▮▮▮▮▮ leave 312 6th St. and drive to the Wegmans parking lot, located at 220 E. Ridge Rd. in Rochester, New York. After spending approximately three (3) minutes in the Wegmans parking lot, ▮▮▮▮▮ then left the parking lot and drove directly to 152/154 Genesee Park Blvd., arriving there at approximately 6:02 p.m. ▮▮▮▮▮ stayed at 152/154 Genesse Park

120

Blvd. for approximately one (1) minute before leaving the residence, and returned back to 152/154 Genesee Park Blvd. thirty (30) minutes later, where ███████ entered 152 Genesee Park Blvd. After approximately six (6) minutes inside 152 Genesee Park Blvd., ███████ was observed leaving the residence with an oval-shaped object in his hands and leaving the area. Later that evening, at approximately 8:39 p.m., **BRENDA ROPER's** red-colored Audi was observed returning to **ROPER's** residence at 367 Dutch Hill Rd. in Frankfort, New York.

193.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced calls, combined with the above-referenced surveillance, your affiant believes that **MICHAEL DIMARTINO** received a package of cocaine from the UPS store at 2604 Elmwood Ave. in Rochester, New York, and transported that cocaine back to his residence of 43 Mercer Ave. Your affiant believes that **DIMARTINO** then took a quantity of that cocaine from 43 Mercer Ave. and delivered said quantity to ███████ at 58 Chandler St. Your affiant also believes that ███████ then took the quantity of cocaine delivered by **DIMARTINO** and personally delivered said cocaine to **STEPHEN MILLER** at 152/154 Genesee Park Blvd. Your affiant further believes that ███████ then took the proceeds of that transaction with **MILLER**, which your affiant believes was present inside the oval-shaped object in ███████ hands as ███████ exited 152 Genesee Park Blvd., along with approximately one (1) kilogram of cocaine to **BRENDA ROPER** at the Wegmans grocery store later that evening.

194.    On June 28, 2024, the Honorable Elizabeth A. Wolford, Chief United States District Judge for the Western District of New York, issued an Order re-authorizing the

interception of wire communications over **Target Telephone 1**, a facility utilized by

███████████

195.    On July 3, 2024, at approximately 10:33 a.m., investigative team members, conducting electronic surveillance, observed **MICHAEL DIMARTINO** leave 43 Mercer Ave. and drive to a UPS store, located at 6558 4th Section Rd. in Brockport, New York, arriving at approximately 10:57 am., where **DIMARTINO** remained for approximately eight (8) minutes before leaving and driving directly back to 43 Mercer Ave.    At approximately 11:35 a.m., **DIMARTINO** was, again, observed leaving 43 Mercer Ave. and driving to another UPS store, located at 1900 Empire Blvd. in Webster, New York, arriving at this location at approximately 11:55 a.m. and remining there for another seven (7) minutes before driving back to 43 Mercer Ave. and parking at approximately 12:23 p.m. Approximately eight (8) minutes later, **DIMARTINO** was observed leaving 43 Mercer Ave. again and driving east on the I-90 New York State Thruway toward Utica, New York.

196.    Later that day, at approximately 3:42 p.m., electronic surveillance observed **DIMARTINO**'s Hyundai Sonata arrive and park in front of 1155 Mohawk St. Suite 4 in Utica, New York, the location of **BRENDA ROPER's** shop, "Queens Corridor". **DIMARTINO** was then observed retrieving two boxes out of the back seat of the Sonata, and placing the boxes in the back seat of a dark-colored Jeep Renegade, bearing New York license plate number LCV2946 and being driven by **BRENDA ROPER**, before leaving the area.

197.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced surveillance, your affiant believes that **MICHAEL**

DIMARTINO received several packages containing cocaine at the UPS stores in Brockport and Webster, New York, transported the packages back to 43 Mercer Ave., and then transported a portion of said packages out to **BRENDA ROPER** in Utica, New York. This investigation has established a pattern where **DIMARTINO** will receive packages of cocaine at various UPS stores around the Rochester, New York area, take said packages back to his residence of 43 Mercer Ave., then transport quantities of cocaine contained within those packages to other DTO members in the Rochester, New York and Utica, New York areas.

198.    On July 8, 2024, at approximately 1:57 p.m., electronic surveillance observed **ROXROY ROPER's** 2022 Honda HR-V EX-L SUV exit the Park South Street community and head toward downtown Los Angeles, California. Approximately 43 minutes later, at 2:40 p.m., electronic surveillance then observed the **ROXROY ROPER's** vehicle arrive and park behind E&G Mailboxes and Watch Repair, located at 357 South Fairfax Avenue in Los Angeles, California. ████████████ was observed exiting the vehicle and entering E&G Mailboxes and Watch Repair while **ROXROY ROPER** walked to the rear of the vehicle and opened the rear hatch. At that time, G.N. was observed approaching **ROXROY ROPER** when **ROXROY ROPER** handed G.N. two (2) boxes from the vehicle. **ROXROY ROPER** then retrieved two (2) more boxes from the vehicle before entering E&G Mailboxes and Watch Repair with G.N.

199.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced surveillance, your affiant believes ████████████ and **ROXROY ROPER** transported a quantity of cocaine to E&G Mailboxes and Watch

123

Repair.  As referenced within this Affidavit, investigative team members have observed ███████████ and **ROXROY ROPER** drive to E&G Mailboxes and Watch Repair on numerous occasions. The packages being transported by ████████████ and **ROXROY ROPER** typically match the size, shape, and characteristics of packages previously seized by investigative team members that contained cocaine.

200.  On July 11, 2024, at approximately 4:36 p.m., investigative team members, conducting electronic surveillance, observed **ROXROY ROPER** arrive and park behind E&G Mailboxes and Watch Repair, located at 357 S. Fairfax Ave. in Los Angeles, California.  **ROPER** was then observed taking two (2) packages out of the rear of **ROPER's** vehicle and handing them to G.N., then retrieving two (2) more packages from the rear of the vehicle and walking them into E&G Mailboxes and Watch Repair with G.N. through the rear entrance.  Later that evening, at approximately 6:04 p.m., investigative team members lawfully intercepted a call from ███████████ utilizing **Target Telephone 1**, to **TORREN MILLER**, utilizing **Target Telephone 2**.  In relevant part, ████████ and **MILLER** communicate the following:

| | |
|---|---|
| ██████ | You know what I'm saying? You're going to have to do another time, man. I was calling you to do something, bro. You didn't pick up. |
| MILLER: | Uh, I seen [sic] your phone call earlier. I, I just don't know why my shit wasn't ringing through. |
| ██████ | Yeah, so I'm gonna have to… [pause] have to do it another time. |
| MILLER: | What did you say? |
| ██████ | Alright? |
| MILLER: | What, what did you say? I didn't hear you all the way. |

124

███████    No, I said I'm gonna have to do another time because, um, you don't be picking up, so…

**MILLER:**    Alright.

███████    Alright?

**MILLER:**    Um, alright. [UI] remember that some of the times, like, 'cause I know, I know, know what I'm saying? How we're going to be moving on that situation.

███████    Huh?

**MILLER:**    I gotta make – Ima make sure to keep my phone on extra loud, rudeboy.

███████    Yeah.

**MILLER:**    [UI].

███████    'Cause I been calling, but I can… I can, do something for you tomorrow, though. So, you would just – just listen out for the phone call.

**MILLER:**    I'll be ready. And, and I'm gon' wait for you, rudeboy.

███████    Okay.

**MILLER:**    Alright.

███████    Alright.

**MILLER**    Alright.

███████    Mmhmm.

201.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, combined with the above-referenced surveillance, your affiant believes **ROXROY ROPER** was delivering several packages of cocaine to E&G Mailboxes and Watch Repair to be shipped to **TORREN MILLER**. Your affiant also believes that ███████████ and **TORREN MILLER** are discussing how ███████

125

█████ wants to bring **MILLER** back as a courier for the DTO. Your affiant is aware that ███████████ stopped utilizing **MILLER** as a courier in June 2024 and, instead, began utilizing **MICHAEL DIMARTINO** as the main courier for the Rochester, New York DTO. When ███████████ tells **MILLER** that he can "do something for you tomorrow", your affiant believes ███████████ is informing **MILLER** that a shipment of cocaine, specifically the packages investigative team members observed **ROXROY ROPER** deliver to E&G Mailboxes and Watch Repair, will be sent to **MILLER**. Your affiant is aware that drug traffickers typically use coded words when discussing their drug trafficking activities to evade detection by law enforcement. In the conversation above, when ███████████ says he'll be "moving on that situation", your affiant believes ███████████ means that he will be shipping another package of cocaine to **MILLER**.

202. On July 12, 2024, at approximately 1:47 p.m., investigative lawfully intercepted a call from ███████████ utilizing **Target Telephone 1**, to **TORREN MILLER**, utilizing **Target Telephone 2**. In relevant part, ██████ and **MILLER** communicate the following:

**MILLER:** Yo?

██████ Hey, Torey.

**MILLER:** Yeah.

██████ What's up?

**MILLER:** What's up?

██████ I'm 'bout to, I'm 'bout to, 'bout to do that thing. Okay?

**MILLER:** Alright. I heard you.

126

██████        But is not the… is not the short one. Is the long one. Right?

**MILLER:**    So, I gotta go the long way?

██████        No, man. No-no-no-no-no. what's I'm saying…

**MILLER:**    Oh, yeah. I know what you meant now.

██████        … okay? Yeah. Mmhmm.

**MILLER:**    Alright. Yeah, do that.

██████        Alright?

**MILLER:**    Yeah. Yeah.

██████        Better. Okay.

**MILLER:**    Fine, that's for me, so there – yeah, do that.

██████        Okay, cool. Alright?

**MILLER:**    Alright. I'm ready. I know it.

██████        Okay, cool.

**MILLER:**    Alright.

203.    Later that afternoon, at approximately 2:56 p.m., investigative team members, conducting electronic surveillance, observed **ROXROY ROPER** arrive and park behind E&G Mailboxes and Watch Repair, located at 357 S. Fairfax Ave. in Los Angeles, California. **ROXROY ROPER** was then observed retrieving two (2) packages from the rear hatch of **ROXROY ROPER's** vehicle and taking them inside of E&G Mailboxes and Watch Repair.

204.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, combined with the above referenced surveillance, your

127

affiant believes **ROXROY ROPER** was delivering a quantity of cocaine to E&G Mailboxes and Watch Repair to be shipped to **TORREN MILLER**. When ▮▮▮▮▮▮▮ tells **MILLER** he's "'bout to do that thing" and "it's the long one", your affiant believes ▮▮▮▮▮▮▮ is telling **MILLER** that he (▮▮▮▮▮▮▮ is shipping a quantity of cocaine to **MILLER** using ground transportation. This investigation has revealed that ▮▮▮▮▮▮▮ prefers shipping cocaine utilizing UPS and FedEx overnight or two-day shipping, which ▮▮▮▮▮▮▮ refers to as "the short one". However, due to several seizures of cocaine from ▮▮▮▮▮▮▮ who was utilizing next-day or two-day shipping at the time, as referenced within this affidavit, ▮▮▮▮▮▮▮ began sending packages utilizing ground transportation, which ▮▮▮▮ refers to as "the long one".

### July 9, 2024 Seizure of Cocaine from ▮▮▮▮▮▮▮

205.   On July 9, 2024, at approximately 12:55 p.m., investigative team members lawfully intercepted a call from ▮▮▮▮▮▮▮ utilizing **Target Telephone 1**, to **BRENDA ROPER**, utilizing (818) 266-2298 (hereinafter "**BR-1**"). In this conversation, ▮▮▮▮▮▮▮ tells **BRENDA ROPER**, "This shit is not working. This – this thing is putting me in a hole and more hole and more, like, I can't get out. It's like I'm burying myself in a fucking hole. This shit is not fucking working, yo. Three fucking boxes. One came through and three box stuck over there," to which **BRENDA ROPER** asks, "Oh, they got here with three? They are not coming through here?" ▮▮▮▮▮▮▮ then says, "No. One got here and the other three got stuck over there – over in Mid – Mid, man, where it's always – always stuck."

128

206.    That same day, U.S. Customs and Border Protection (CBP) officers were conducting routine canine sniffs of co-mingled UPS parcels at the UPS World Hub in Louisville, Kentucky, when a CBP canine alerted to the presence of narcotics in three (3) separate packages.    All three (3) packages were detained and Kentucky State search warrants were subsequently written for and signed by the Honorable S. Nicholson, Jefferson County Court Judge.    A search of all three (3) packages revealed a total of approximately 7.39 kilograms of a white, powdery substance.    Seizing officers conducted a subsequent Thermoscientific TruNarc field test of the white, powdery substance, which returned positive for the presence of cocaine.    All three parcel shipping labels had a return address of E&G Mailboxes at 357 S. Fairfax Ave. in Los Angeles, California.    The seized cocaine and the packages are depicted below.





207.    Based on my training, experience, and knowledge of the investigation, and based on the above-referenced call, combined with the above-referenced seizures, your affiant believes that the conversation between ████████████ and **BRENDA ROPER** pertains to three (3) packages of cocaine above that were seized during shipping on July 9, 2024.    Based on the fact that ████████ utilizing **Target Telephone 1**, tells **BRENDA ROPER**, utilizing **BR-1**, that he "three got stuck over there" as well as the packages having shipping addresses to Rochester, New York, with return addresses of E&G Mailboxes in Los Angeles, California, ████████████ is referring to the approximately 7.39 kilograms of cocaine seized from the UPS facility hub in Louisville, Kentucky.

## CONCLUSION

208.    **WHEREFORE**, based on the above information, I submit there is probable cause to believe that between October of 2023 to present (July of 2024), in the Western District of New York, ████████████ **ROXROY ROPER, BRENDA ROPER, TORREN MILLER, MICHAEL DIMARTINO,** ████████████ ████████████ and **STEPHEN MILLER** were in violation of Title 21 United States Code §   846 and

130

841(a)(1)(A) (conspiracy to possess with the intent to distribute and to distribute 5 kilograms or more of cocaine).

I, **MATTHEW D. HUDSON**, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information and belief.

MATTHEW D. HUDSON
Special Agent
Homeland Security Investigations

Application and Supporting Affidavit
submitted electronically by email in .pdf
format. Oath administered, and contents and
signaute attested to me and before me as true
and accurate telephonically pursuant to
Fed.R.Crim.P 4.1 and 41(d)(3) on _26_ day of
July, 2024. at 1:05 p.m.

HON. MARIAN W. PAYSON
United States Magistrate Judge
Western District of New York

131